IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| SHERRY LUCKERT, Personal | ) | Case No. 8:07cv-5010 |
| Representative of the Estate of | ) | |
| TROY SAMPSON, Deceased, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **PLAINTIFF'S BRIEF IN OPPOSITION** |
| | ) | **TO DEFENDANTS' MOTION FOR** |
| COUNTY OF DODGE, a Political | ) | **SUMMARY JUDGMENT BASED ON** |
| Subdivision, DOUG CAMPBELL, in | ) | **QUALIFIED IMMUNITY** |
| his individual and official capacity; | ) | |
| TIFFANY WILLMS, in her individual | ) | |
| and official capacity; JO-EL CHILES, | ) | |
| in his individual and official capacity; | ) | |
| CYNTHIA JULIAN, R.N., in her | ) | |
| individual and official capacity; and | ) | |
| MARK ROBESON, in his individual and | ) | |
| official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

Sherry Luckert[1], Plaintiff in the above-captioned matter, by and through her counsel of record, submits this Brief in Opposition to Defendants' Motion for Summary Judgment Based on Qualified Immunity:

## FACTUAL BACKGROUND

### Introduction

Between January 1, 2000 and August 10, 2006 (the date of SAMPSON's death), 21 inmates attempted suicide in the Dodge County jail in Fremont, Nebraska. (*E39.*) Three of those inmates, including SAMPSON, succeeded in their suicide attempts. (*Id.*) A few weeks after SAMPSON's death, another inmate hung himself in the Dodge County jail, bringing the six-year total to 22

---

[1]LUCKERT is the mother of Troy Sampson. She harbors no delusions that her son was a law-abiding citizen, but she loved him; and she would rather have him alive and in jail than dead.

suicide attempts with four successful suicides. Three of the four successful suicides, including SAMPSON's, featured hanging from an air vent in the inmate's cell – SAMPSON, the suicide of inmate Darrough in 2001 and the suicide of inmate Beerbohm after SAMPSON's suicide. (*Campbell depo.* 120:05 - 12.)

After inmate Darrough hung himself from an air vent in 2001, a grand jury investigated his death. It did not issue indictments, but it made recommendations to Dodge County and to its jail administrator, Defendant CAMPBELL. (*E51.*) The 2001 recommendations included:

> \*      **2001 recommendation:**
> Changing county policy regarding inter-shift communication (*Campbell depo.* 29:01.), on a finding that the "pass along book" was inadequate as a means of communicating potential problems with inmates. (*Id.*)
> **Facts as of August 10, 2006:**
> As of the date of SAMPSON's death, that 2001 recommendation had not been implemented. CAMPBELL testified, "I don't believe that anything in the policy and procedure manual was changed." (*Campbell depo.* 31:15.) Relative to SAMPSON's case, one important fact in the pass along book was SAMPSON's mother's report that SAMPSON had tried to hang himself shortly before his arrest. JULIAN, the nurse in charge of keeping SAMPSON alive, can't remember reading the pass along book with regard to SAMPSON: put otherwise, that the deficiency identified by the grand jury in 2001 was alive and well in 2006.

> \*      **2001 recommendation:**
> Requiring the shift sergeant to remain in the cell block area during his shift to effectively supervise other employees. (*Id.* 31:17.)
> **Facts as of August 10, 2006:**
> As of the date of SAMPSON's death, that 2001 recommendation had not been implemented. (*Campbell depo.* 32:10.)

> \*      **2001 recommendation:**
> Installing a cost-effective means for prisoners to communicate with control room officer if feasible. (*Id.* 32:15.)
> **Facts as of August 10, 2006:**
> As of the date of SAMPSON's death, that 2001 recommendation had not been implemented. CAMPBELL had no documentation to even show that feasibility had been studied, and could not cite names of anyone else who had

allegedly studied its feasibility.  (***Campbell depo.*** 32:20 - 33:05.)[2]

Although the 2001 grand jury did not issue specific recommendations relating to air vents, CAMPBELL understood from the circumstances of inmate Darrough's death that air vents are strong enough to support the weight of a hanging adult man.   (***Campbell depo.*** 119:23 - 120:13.) CAMPBELL acknowledges that he could have asked someone, such as a contractor, to fashion a cover for the vents in the time between inmate Darrough's death in 2001 and SAMPSON's death in 2006.  (***Id.*** 232:22.)  But that risk to safety, like the risks identified by the grand jury, was not addressed until <u>after</u> SAMPSON and inmate Beerbohm hung themselves from air vents at the end of 2006.  (***Id.*** 232:04.)

In those uncorrected but risky conditions, double-digit numbers of inmates proceeded to attempt suicide in the Dodge County facility between inmate Darrough's death in 2001 and August 10, 2006, when SAMPSON died.  (***E39.***)  Neither the fact of inmate Darrough's death, nor the Darrough grand jury's recommendations, nor the continuously high number of suicide attempts between 2001 and 2006 persuaded Defendants to change any of their policies, the construction of

---

[2] It should be noted that CAMPBELL, in his Affidavit in support of this Motion, testified that

> [w]ith respect to the plaintiff's claim that the grand jury had issued recommendations for suicide prevention procedure and training prior to Troy Sampson's suicide that were not implemented by the county, the plaintiff cannot support this claim with any documents whatsoever.

(Evidence Index in Support of Defendants' Motion for Summary Judgment, ***Campbell Affidavit*** at ¶ 10; ***see also*** Evidence Index in Opposition to Defendants' Motion for Summary Judgment, ***Campbell depo.*** 26:21.)  This, like every other statement in CAMPBELL's affidavit, is ostensibly intended to persuade this Court that this case should be dismissed, ostensibly on the presumption that what CAMPBELL says is truthful.  After the undersigned confronted him with the facts during his deposition, CAMPBELL admitted that this portion of his testimony is **<u>false</u>**. (***Campbell depo.*** 37:04 - 23)

their cells or the conditions criticized by the Darrough grand jury.  As of August 10, 2006, Defendants were very well aware that their jail was an unreasonably hazardous place for a mentally ill inmate.

In light of the assertions in Defendants' affidavits that they had no idea that SAMPSON was suicidal, perhaps one of the most important undisputed fact is that **at the time that he died by hanging, SAMPSON** _was_ **on suicide watch and** _was_ **still classified as a suicide risk:**

> Q:     As I understand it, Troy remained on suicide watch until his death, correct?
>
> A:     I believe so, yes.
>
> Q:     And he was on suicide watch at the time he committed suicide?
>
> A:     Yes, he was.

(*Julian depo.* 73:22 - 74:03.)  Whatever comments correctional staff and Dr. Shoiab[3] have made in their affidavits about SAMPSON seeming to be friendly or cheerful[4], the fact is that as of August 10,

---

[3]There is no evidence that WILLMS, CHILES, or even JULIAN was aware, as of August 10, 2006, of the claims now made by Dr. Shoiab in his Affidavit about SAMPSON's demeanor on that date – there is no evidence, because WILLMS, CHILES and JULIAN did not attend SAMPSON's meeting with Dr. Shoiab and because they did not know what Dr. Shoiab saw or said or wrote.  Even if Dr. Shoiab is testifying truthfully about SAMPSON's demeanor on that date, one is reminded of the admonition in Policy 12.4 (on which WILLMS and JULIAN had not been trained as of August 10, 2006, but which ostensibly was a standard for DCDC employees to follow):  **"The inmate may appear to be emerging from a prolonged depression and exhibit a mood boost.  This may signal an impending suicide attempt as the inmate feels a sense of relief because it will all be over soon."**  CAMPBELL admitted that pursuant to Policy 12.4, a sudden mood boost is cause for _more_ caution (a "heightened state of awareness"), not less. (*Campbell depo.* 91:01.)

[4]Those affiants who were deposed testified that the impressions of SAMPSON recorded in their affidavits are overblown.  WILLMS admitted that her interactions with SAMPSON were short and were limited to matters such as giving SAMPSON his medications, and that they never had a long conversation.  (*Willms depo.* 29:21 - 30:14.)  Juedes described his interactions with SAMPSON as "very, very brief."  (*Juedes depo.* 27:18.)  CHILES never had any conversations

2006, Defendants had not removed SAMPSON from suicide watch – presumably for a reason. **And that disconnect, between Defendants' claims of SAMPSON's "normal"/"improved" behavior and the fact that Defendants left SAMPSON on suicide watch, demonstrates a credibility issue that should preclude entry of summary judgment.**

A.      Population of the Dodge County Jail

Although the DCDC has 42 beds, its average daily population in 2006 was 59.73 prisoners. The facility averaged 18.68 Dodge County prisoners boarded "out of county" in 2006 overall, but the average number of prisoners boarded "out of county" from August through December[5] was 28.36. Consultant Gary Bowker of Allied Correctional Services, hired by Dodge County after inmate Beerbohm's suicide in late 2006, advised Dodge County that:

> Crowding of this nature places extraordinary demands on staff and the facility, including but not limited to the following:
>
> *        Staff dedicated to inmate transports.[6]
>
> *              *             *             *             *             *
>
> *        Increased stress and demands on staff;
>
> *        Contract county facilities only want to keep the more compliant and easy-to-manage and -control inmates. This leaves Dodge County Jail population with responding to the more non-compliant inmate who is more difficult to manage. This variable places increased demands and stress on staff.

---

with SAMPSON that he can recall. (***Chiles depo.*** 49:01 - 17.)

[5]SAMPSON died on August 10, 2006.

[6]On the afternoon that SAMPSON died, Defendant ROBESON and Defendant WILMS had been involved in transporting a prisoner up to about thirty minutes before SAMPSON died, and thus missed the shift change meeting.

5

(**Bowker report** at 21.)

Bowker addressed the claim that a jail booked at capacity is not overcrowded, for purposes of assessing risk, staffing and such:

> [w]ith only a single safety cell and the lack of a special needs or special management housing unit to house and continuously monitor inmates with serious behavior problems and/or suicidal tendencies, facility staff are limited in their housing classifications for this group.  Persistent issues of crowding at the facility can also serve to complicate management and operations and housing decisions.  While it is commendable that the County Board has been supportive of boarding inmates in excess of the facility capacity of 42 inmates in other counties, the existing facility is taxed beyond its capabilities.  It is a common standard in the corrections field that most facilities are "functionally full" at 80 to 85% of capacity ... In addition, staff are more prone to stress, burnout and perhaps "just not enough time to get everything done the way it needs to be done" when capacity limits are exceeded.

(**Bowker report** at 26 - 27.)  Bowker found that "the facility has been persistently overcrowded for at least the past three years."  (**Id.** at 29.)

In that regard, Defendant JULIAN used "overfilling" (her word) of the jail as an excuse for her health care decisions for SAMPSON.  A few days after SAMPSON was booked into the jail, JULIAN corresponded with SAMPSON's psychiatrist at the Norfolk Regional Center, Dr. Stephen O'Neill.  SAMPSON had asked to see Dr. O'Neill, and JULIAN wrote to Dr. O'Neill of this request:

> I would be happy to send him to see you before then, but unfortunately we are too overfilled to be able to bring him to you any earlier than Wednesday.

(**Julian depo.** 85:12; **E45**.)  JULIAN equivocated in her deposition and argued that she does not remember writing the term "overfilled" (**Julian depo.** 85:18 - 86:14.), but Dr. O'Neill recalls JULIAN using similar phraseology when he talked to her via telephone:

> I informed [JULIAN] that [SAMPSON] has problems with posttraumatic stress disorder from being involved with a head injury as well as a personality disorder.  I also informed her that he has had some suicidal thinking in the last week or so.  She asked my opinion about placing the patient on suicide watch.  I informed her that I

thought it would be a good idea. *She stated that the jail is overcrowded*.

(*O'Neill affidavit,* Exhibit A (emphasis added).)

Larry Juedes, who volunteers his time as a Bible study leader at DCDC, also felt that the jail was overcrowded. He recalled that DCDC was housing up to 60 inmates at times, and used the rec room as a sleeping dorm when it ran out of cells. (*Juedes depo.* 22:24 - 24:04.) In Juedes' words, "it was obvious that they were full." (*Id.* 24:08.)

Defendant ROBESON, the shift supervisor at the time of SAMPSON's death, resigned from Dodge County Department of Corrections as of December 19, 2006. According to a letter from CAMPBELL memorializing their "exit interview," one of the issues that led ROBESON to resign was "overcrowding in the jail." (*E21.*) CAMPBELL denies that the jail was overcrowded (*Campbell depo.* 40:10.) – but ROBESON, Juedes, JULIAN and Bowker apparently disagree with CAMPBELL.

B.      Staffing and training

        *1)      Staffing*

Consultant Gary Bowker observed that at the time of his review in late 2006, "ten of the current 19 corrections officers have less than one year on the job." (*Bowker report* at 22.) Bowker observed that the high turnover rate among corrections staff results in significant cost and loss of efficiency involved in recruiting, hiring, orientation and training. Moreover, Bowker observed, "the continuing increase in the number of prisoners boarded out of county is placing inmate transport demands on staff that takes them away from working security and supervision posts in the facility." (*Bowker report* at 27.) During day shifts, Dodge County and CAMPBELL (as its policymaker) provided for only two officers to "work the floor" for the entire jail.

        *2)      Training in, and historical compliance with, jail policies and procedures*

7

The grand jury that reviewed SAMPSON's death wrote that "more staffing could be a deterrent to loss by suicide."  Defendant WILLMS, who was one of the last two people to see SAMPSON alive, agreed with this statement.  (**Willms depo.** 102:06.)  She clarified that "[h]aving more staff could alleviate all of the pressures on just those four people that are working ..."  (**Id.** 103:09.)  WILLMS further clarified that "I technically probably shouldn't have been alone," because she had not completed training and orientation.  (**Id.** 105:08.)  WILLMS had been on the job exactly 10 days as of the day of SAMPSON's death, which was her first day of working the floor on her own (in the preceding nine days, she had spent her time shadowing the comparatively more experienced officers).  (**Willms depo.** 17:07) She had not even gone through basic orientation as of the date of SAMPSON's death.  (**Id.** 16:14.)

JULIAN, the jail nurse, had been employed by Dodge County for one month as of the date of SAMPSON's death.[7]  (**Julian depo.** 14:10.)  She, too, had not yet participated in DCDC basic orientation training.  (**Id.** 25:06.)  As far as her memory serves, she had not read or been trained in DCDC's policies and procedures relating to suicide prevention, including Policy 12.4, before SAMPSON died.  (**Id.** 37:11.)

Larry Juedes is a lay minister who was among the last people to encounter SAMPSON before his death.  Although Larry Juedes was not a paid employee of Dodge County, he volunteered in the

---

[7]Before she began work at Dodge County, JULIAN's primary work was as an insurance case manager, which is to say that it was her job to protect her insurer's assets by finding reasons to say "no" to requests for services from insureds.  The undersigned contemplates the parallels between the interests of an insurance case manager and a jail nurse, and whether the former job would condition a person beginning work at the latter job to say "no" as the default answer to a request for medical services, rather than making a good-faith inquiry as to a patient's medical needs.

8

jail at the pleasure of Dodge County, and he knew he was expected to follow Dodge County's rules as a condition of access to inmates. Juedes also agrees that Dodge County benefitted from his volunteer work as a lay minister, as his generosity spared Dodge County from the need to hire a paid chaplain. Dodge County has so benefitted from Juedes' volunteer work for over 20 years. Dodge County exposes Juedes, who conducts biweekly Bible studies, to inmates with mental health issues and serious personal stress. Yet, Dodge County has not provided Juedes with any training at all in how to identify suicide risks or in what to do if he does identify an inmate as being at risk of suicide.

There are live questions as to the qualifications of the more experienced officers: CHILES, the other officer assigned to SAMPSON on August 10, 2006, had received 26 written reprimands (and additional oral reprimands) and suspensions for misconduct between June 2002 and August 10, 2006. (**Campbell depo.** 173:02 - 17.) Many of those reprimands were for not showing up to work or showing up late (**Id.** 173:23 - 174:02.), which of course impacts staffing and the ratio of staff to inmates who must be supervised. Ten days before SAMPSON's death, a jail sergeant wrote a "significant incident" reprimand for CHILES' late arrival to work one month prior[8], and instructed that "next time this happens, a counseling form will be done." (**E7; see also Campbell depo.** 176:12.) Apparently undeterred by that threat (or any of the 25 prior threats), CHILES was 45 minutes late to work on the date of SAMPSON's death, arriving just about a half-hour before SAMPSON died. (**Campbell depo.** 176:17.)[9] CAMPBELL admits that CHILES' policy violations related to the safety

---

[8]CAMPBELL agrees that there is no good reason for the supervising sergeant to have waited a month – which is what happened – to write a reprimand for policy violations. (**Campbell depo.** 175:03 - 18.)

[9]In spite of the threat in July 2006 that "next time this happens, a counseling form will be done," no one wrote any form of reprimand for CHILES for his late arrival on the date of

and security of the institution, including the safety of the inmates. (***Id.*** 179:06, 181:21.)

Among the issues ROBESON raised in his "exit interview" with CAMPBELL in December 2006 were "the ethics of the younger staff members not caring about their jobs, being lazy and not wanting to work ..." (***E21.***)  ROBESON agreed that CHILES had issues with showing up for work (which was an issue on the date of SAMPSON's death) (***Robeson depo.*** 15:23.).  He testified:

> Q:  When you are the supervisor and one of your few floor officers is a guy that's got CHILES' ethics, how does that make things harder for you?
>
> A:  Well, then you've got to find somebody to work for him.
>
> \*          \*          \*          \*          \*          \*
>
> Q:  Now, what if I'm CHILES and I say to you, look, Lieutenant Robeson, if I'm a little late, so what.  That doesn't affect the safety of the facility, does it? What would you say?
>
> A:  The safety of the facility?
>
> Q:  Yeah.
>
> A:  If I'm short an officer, yeah, it does.

(***Id.*** 17:02, 32:25.)  Yet in spite of the fact that Dodge County needed to write up CHILES nearly monthly for one violation or another, it left him on staff and, on August 10, 2006, had no one working the floor but a ten-day employee (WILLMS) and CHILES, who was late.

    *3)*    *Training in suicide prevention in particular*

Although Defendants produced various materials relating to suicide prevention in response

---

SAMPSON's death – a paradox, since the jail had not been shy about issuing written reprimands to CHILES 26 times in the four years before SAMPSON's death (and ten more times in the two years after SAMPSON's death).  CHILES' late arrival on the date of SAMPSON's death seems to be the only misconduct for which DCDC and CAMPBELL did not write him up.

to our request for copies of their training materials, the fact that Dodge County had those materials in its library does not show that staff actually received that training.  None of the officers working on the date of SAMPSON's death had received any training in jail suicide in at least one year preceding SAMPSON's death, if at all:

    \*    **WILLMS**, the officer who was performing SAMPSON's suicide watches in the hour leading up to his death, did not receive any training in suicide prevention until after SAMPSON's death.  (***Willms depo.*** 50:06; *see also* ***E53***.)  CAMPBELL testified:

        Q:    How would [WILLMS] have learned anything about suicide prevention before [SAMPSON's] death?  Just whatever CHILES and her other superior officers would have told her?

        A:    Yes, and then at that time she was supposed to be working with the senior officer.[10]

        Q:    So how do you know what the senior officers were telling her about suicide prevention?

        A:    At that point I don't.

        Q:    Do you know if any of the senior officers ever told her anything at all about suicide prevention?

        A:    At – within the first week, I probably doubt it.

    (***Campbell depo.*** 80:05.)

    \*    **CHILES**, the other correctional officer who was "working the floor" when

---

[10]She wasn't.  WILLMS testified:

    Q:    If I'm understanding you correctly, up to the time when you found SAMPSON, you were pretty much on your own that day?

    A:    Correct.

(***Id.*** 82:01.)

11

SAMPSON died, was trained in jail suicide issues in June 2003 and February 2005, then not again until February 2007. (*E56.*)

* **ROBESON**, the supervisor on duty when SAMPSON died, underwent training in jail suicide issues in 2003 and 2005. (*E57.*)

* Another jail employee, Wayne Hank, was working in the control room on the date of SAMPSON's death. He received no training in suicide prevention until November 7, 2006, three months after SAMPSON died. (*E54.*) Employee Stacy Huffman, who finished her shift before SAMPSON died, had been trained in jail suicide issues only in early 2005. (*E55.*)

* **JULIAN** had had no training in suicide prevention in jail before SAMPSON's death. (*Julian depo.* 35:21.)

Had these employees been trained, they would have learned that – by Dodge County's Policy 12.4 and training materials (*E30*, p. 4.), there is significance to a suicidal inmate's sudden mood change – that this is recognized as a sign that the inmate may have settled his decision to kill himself.[11]

4)   *Training in communication*

Based on his own investigation (which was at Dodge County's request, and which included interviews of Defendants JULIAN and CAMPBELL), consultant Gary Bowker determined that DCDC policies and procedures relating to officer communications about suicidal inmates needed to be reviewed and updated on such issues as:

* Officer to supervisor and nurse or counselor regarding receiving/screening concerns at admissions;

---

[11]CAMPBELL understands this to be true (*Campbell depo.* 87:15.). In fact, he even told a newspaper reporter that "if someone is suicidal, they're not always depressed and despondent. Sometimes they go from despondent to happy because they've made that decision. (*E58; see also Campbell depo.* 90:14 - 25.) CAMPBELL says that his officers should "have a heightened state of alert, report it" (*Campbell depo.* 92:03.) if a suicidal inmate suddenly appears to be "emerging from a prolonged depression." (*Policy 12.4.*) How CAMPBELL – as the policymaker for Dodge County Corrections – expected his staff to know that without being trained is unclear.

* Supervisor to nurse or counselor on medical (suicide) watch initiation;

* Nurse to supervisor, officers and counselor on medical (suicide) watch initiation;

* Nurse to counselor on suicidal inmates;

* Nurse/supervisor issues related to removal of suicide watch;

* Nurse communication to psychiatrist or jail physician regarding suicidal prisoners; and

* Shift-to-shift communication on medical (suicide) watch or concerns.

(**Bowker report** at 32.)  Bowker's findings in 2007 are consistent with the findings of a 2001 grand jury, investigating the suicide of inmate Darrough (in exactly the same method SAMPSON used, hanging from an air vent), that DCDC had inadequate methods of communicating potential problems with inmates.  (**Campbell depo.** 29:01; **E51**.)  In six years, very little if anything changed to improve communications for the protection of inmates.

To match the evidence in this case to Bowker's concerns, one sees that there was a serious, severe lack of effective communication on the issue of how to prevent inmates from receiving the death penalty in the Dodge County jail.   The areas of need identified by Bowker, and the corresponding evidence, show:

* ***Area of need identified by Bowker:***
  *Officer to supervisor and nurse or counselor regarding receiving/screening concerns at admissions.*
  **Facts as of August 10, 2006**
  This area was a disaster.  Although JULIAN says that "I try to read the pass-along book every day," she cannot remember either reading the pass-along book or otherwise being informed of the notation in the pass-along book that SAMPSON's mother had called to warn of SAMPSON's recent attempt to hang himself.  (**Julian depo.** 93:16.) How does a jail prevent suicide when its officers and its nurses do not

communicate on information directly relevant to suicide risk?[12]

* ***Area of need identified by Bowker:***
  *Supervisor to nurse or counselor on medical (suicide) watch initiation.*
  **Facts as of August 10, 2006**
  At least JULIAN was aware that the booking officer had placed SAMPSON on suicide watch.

* ***Area of need identified by Bowker:***
  *Nurse to supervisor, officers and counselor on medical (suicide) watch initiation.*
  **Facts as of August 10, 2006**
  Another disaster: JULIAN did not document why she left SAMPSON on suicide watch, or why she reduced the frequency of SAMPSON's suicide watches from every 20 minutes to every 30 minutes. (***Julian depo.*** 71:11 - 21.) JULIAN admits she did not follow Policy 12.4's requirements that she document a suicide level form and a daily suicide notebook. (**Id.** 46:03.) She explains, "I've never known that you had to go in and write an update every day on someone on a suicide assessment" (**Id.** 48:25.), although that requirement is written into Policy 12.4. By her own admission, JULIAN did not document status changes for inmates on suicide watches. (**Id.** 47:14.) This is a failure of training and a failure of initiative by this employee of one month.

* ***Area of need identified by Bowker:***
  *Nurse to counselor on suicidal inmates.*
  **Facts as of August 10, 2006**
  SAMPSON never received counseling or psychotherapy. He received medication management only, from Dr. Shoiab. There is no evidence that any Defendant ever made any effort to arrange for counseling for SAMPSON in spite of his known suicidality.

* ***Area of need identified by Bowker:***
  *Nurse/supervisor issues related to removal of suicide watch.*
  **Facts as of August 10, 2006**
  SAMPSON was never removed from suicide watch. Given that JULIAN did not

---

[12]The fact that there was no apparent communication on this issue suggests one of two things to be true: either (1) the booking officer and JULIAN did not recognize the information communicated by SAMPSON's mother to be relevant to assessing SAMPSON's risk of suicide, which reflects an utter failure of training; or (2) the booking officer and JULIAN knew the information communicated by SAMPSON's mother was relevant to assessing suicide risk, but didn't care enough for the officer to tell JULIAN or for JULIAN to read the pass-along book. Either way, it is evidence of deliberate indifference.

communicate to anyone why she reduced the frequency of SAMPSON's suicide watches, and did not document his daily status or status changes, why would it be reasonable to assume that she would communicate issues relating to the removal of any inmate from suicide watch?

    *    ***Area of need identified by Bowker:***
*Nurse communication to psychiatrist or jail physician regarding suicidal prisoners.*
**Facts as of August 10, 2006**
There is no evidence that JULIAN told Dr. Shoiab that SAMPSON had tried to hang himself shortly before his arrest, or that Dr. O'Neill advised her of SAMPSON's suicidal thoughts in the week before his arrest.  This is a failure.

    *    ***Area of need identified by Bowker***
*Shift-to-shift communication on medical (suicide) watch or concerns.*
**Facts as of August 10, 2006**
Another set of failures: for example, Officer Sheila Cassett failed to tell anyone of SAMPSON's pleas at his August 8, 2006 bond hearing for mental health treatment. Nearly every day of SAMPSON's incarceration, staff missed at least one suicide watch – and either no one noticed, or else staff noticed but failed to follow up and investigate the missed watches.  Staff failed to give SAMPSON his psychotropic medication on one day, and again either no one noticed, or else staff noticed but failed to follow up and investigate.

Bowker was onto something big.  The evidence shows that COUNTY and CAMPBELL did not train jail employees in identifying what must be communicated, and does not police jail employees in whether communication happens as it should.  There is no reason to think anything has improved as a result of SAMPSON's suicide or as a result of the grand jury's or Bowker's recommendations: CAMPBELL says that **nothing** in the Policy & Procedure Manual has changed.  (**Campbell depo.** 31:15.)  Put otherwise, there are no new procedures to improve communications in the deficient areas identified by Bowker.

C.      Housing

      On the issue of the safety cell, consultant Gary Bowker found that even the "safety cell" was still not suicide resistant – it has a partial "bunk" that can be used to attempt suicide.  (**Bowker**

15

*report* at 25.)  Moreover, Bowker noted that the safety cell (of which there is just one) is used for purposes other than suicide watch: "Additional 'medical watch' or special needs inmate housing is needed.'" (*Id*. at 28.)  Bowker clarified that DCDC lacks a unit that could adequately respond to and house inmates with significant mental health issues.  (*Id*.)

D.      Adequacy of DCDC suicide prevention policy

The DCDC Policy & Procedure Manual (*E52*.) includes Policy 12.4, "Suicide Intervention," which was effective on August 10, 2006, the date of SAMPSON's death.  CAMPBELL testified that the policy has not changed since August 10, 2006.[13]  (*Campbell depo.* 81:04.)

Lindsay M. Hayes is the project director of the National Center on Institutions and Alternatives, and the editor of the Jail Suicide/Mental Health Update quarterly newsletter.  He serves as a federal court monitor of suicide prevention practices in correctional facilities.  He has served as project director for the only studies funded by the United States Department of Justice of jail and prison suicide.  (*Hayes affidavit* at 1 - 3.)  For this case, Hayes reviewed DCDC Policy 12.4, "Suicide Intervention," which was effective on the date of SAMPSON's death.

Hayes compared DCDC Policy 12.4 to the American Correctional Association (ACA) *Performance-Based Standards for Adult Local Detention Facilities* and the National Commission on

---

[13]This answer was, as it turns out, duplicitous.  While Policy 12.4 does remain the same, further testimony from another witness (JULIAN) revealed that JULIAN had, in her words, "rewrote" Policy 12.4 in the year to 18 months before the December 2008 depositions.  (*Julian depo.* 41:17.)  She has discussed her proposed changes with CAMPBELL (*Id.* 42:17.) – a fact CAMPBELL omitted from his testimony – and the proposal was apparently medically approved by correctional doctors.  (*Id.* 43:14.)  The proposal has evidently sat on CAMPBELL's desk since then, for 12 to 18 months.  We may never know what the new policy says, incidentally, because JULIAN cannot remember how she changed Policy 12.4 (*Julian depo.* 42:07.) and, when we served Defendants with a Request for Production for the new copy, Defendants objected and refused to answer (which may indicate confusion between "admissibility" and "discoverability").

Correctional Health Care (NCCHC) *Standards for Health Service in Jails*.  ACA standards require "continuous observation" of suicidal inmates; NCCHC standards require monitoring suicidal inmates at least every 15 minutes (***Hayes affidavit*** at ¶ 9.).  In comparison, DCDC Policy 12.4 fails to define the frequency with which jail staff should visualize "Alert"-level suicidal inmates; and it allows for visual checks of "Watch"-level suicidal inmates of 20 minutes apart.  (***Id.*** at ¶ 11.)

When compared to the nationally-recognized standards and practices for frequency of monitoring suicidal inmates (ranging from "continuous" to no more than 15 minutes apart), DCDC's 20- and 30-minute watches are inadequate.  (***Hayes affidavit*** at ¶ 12 - 13.)  As Hayes observed, the 30-minute watch ordered by Defendant JULIAN "was not even authorized within the Dodge County Department of Corrections' *Suicide Intervention Policy* No. 12.4."  (***Id.*** at ¶ 13; ***see also Julian depo.*** 52:19 - 24.)  Indeed, JULIAN herself is unsure of the authority in DCDC policies and procedures for a 30-minute watch (***Julian depo.*** 54:02.) – even though it was JULIAN who ordered that the frequency of watching SAMPSON be downgraded from 20 minutes to 30 minutes.  (***Id.*** 71:09.)

The policy does provide some useful guidance for an employee who familiarizes himself with and follows it.  For example, the policy warns officers that if an inmate appears to emerge from depression exhibits an unexpected change of mood, that can actually be a sign of an impending suicide attempt.  (***E52***, Policy 12.4; ***Julian depo.*** 61:03.)  Since every Defendant has claimed in his Affidavit in support of summary judgment that SAMPSON appeared to be friendly and happy before he died, this is a significant provision of Policy 12.4.  CAMPBELL, as director of the jail, had no disagreement with this provision, testifying:

> Q:     So what do you do with an inmate who has been psychiatrically unstable and on suicide watch, and suddenly they exhibit this sudden mood change like what's described in your policy?  What's the response when you notice that

17

– what do you expect your officers to do?

A:     Like in this particular case, that would be up to the medical department.

Q:     Well, if they're still on suicide watch and they exhibit this change, what do you expect your officers to do?  Medical department are not the ones that are watching them from day to day, right?

A:     Correct.

Q:     So what do you expect your officers who are watching them to do, when you have an inmate who shows a sudden or unexpected change in mood?

A:     Have a heightened sense of awareness, report it.

Q:     You want them to be more careful, not less, right?

A:     Right.

(***Campbell depo.*** 91:01.)

E.     How well was the policy followed?

    1)     *Policies regarding placement on suicide watch and documentation of suicide watch – not followed*

Policy 12.4 requires the nurse or shift supervisor to complete a "suicide level form" and place it in the "suicide notebook" on a daily basis.       (***Policy 12.4 "Suicide Intervention***; ***Julian depo.*** 44:22 - 45:24.)  JULIAN admits she did not follow that part of the policy and, in fact, does not even recall seeing a "suicide level form" specified by Policy 12.4.  (***Julian depo.*** 46:03.)  She explains, "I've never known that you had to go in and write an update every day on someone on a suicide assessment" (***Id.*** 48:25.), although that requirement is written into Policy 12.4.

Although Policy 12.4 requires the nurse to write daily updates for the status of all suicidal inmates, JULIAN testified that she would only write an update if the inmate's status had changed in some way.  (***Julian depo.*** 47:06 - 13.)  That admission alone violates Policy 12.4; but in fact,

18

however, JULIAN did not even document status changes:

> Q:     How about changing [frequency of watches] to 30 minutes?  Is that the kind of thing that you would document – the reason that you had lengthened the watch from 20 to 30 minutes?
>
> A:     Usually, yeah.
>
> Q:     But you didn't do that with Troy Sampson, did you.
>
> A:     I may not have.
>
> Q:     That's a policy you violated?
>
> A:     Must have.  So maybe I hadn't read this before.  I don't know.

(***Julian depo.*** 47:14.)

Indeed, when JULIAN downgraded the frequency with which staff should observe SAMPSON from every 20 minutes to every 30 minutes, she made no notations of what changes in behavior (if any) justified that modification:

> Q:     At 1600 [hours], he was moved to 30-minute suicide watch.  Have I put these –
>
> A:     Which date are we on, 7/31?
>
> Q:     Right.  Am I putting these together correctly?
>
> A:     Yeah.  He was on 20, and then he was changed to 30.
>
> Q:     Did you document the reason that you felt that he was now less suicidal enough that he could be checked every 30 minutes instead of every 20 minutes?
>
> A:     I don't recall.  I'd have to look at my notes in there to see if there is a form or a documentation in there.  I don't know ...
>
> Q:     Should you have documented that?
>
> A:     It would have been – definitely would have been useful to document that.

19

(*Julian depo.* 71:11 - 21.)

    2)      *Policy regarding monitoring – not followed*

DCDC has one safety cell, which is suicide resistant.  (*Campbell depo.* 118:19.)

And apparently as of August 7 (over one week into SAMPSON's incarceration), the safety

cell was unavailable at any rate.  JULIAN testified:

> Q:    Paragraph 15 of your affidavit says that as of the 7th of August, a safety cell had been damaged by an inmate?
>
> A:    Uh-huh.
>
> Q:    What kind of damage?
>
> A:    We had an inmate that had broken the window, not in the door, but actual window in the safety cell.

(*Julian depo.* 148:21.)

Ostensibly for that reason, SAMPSON was not placed in the safety cell.  Nor was he placed

in the detox cell or anyplace else where he could be closely observed.[14]  He was placed in E Unit,

which CAMPBELL describes as a general population unit for "pretty much any kind of inmate."

(*Campbell depo.* 122:19.)  The DCDC policy manual disagrees with CAMPBELL and states that E

Unit cells are for inmates who are incorrigible or who are a threat to someone else; CAMPBELL says

the policy manual is "not entirely" accurate in that regard.  (*Id.* 123:14.)  CAMPBELL admits that

---

[14]Mark Robeson, a now-retired jail lieutenant who was the shift supervisor on the date of SAMPSON's death, testified:
> Q:    Once an inmate is put on a watch, where should he be put in the facility?
> A:    Depends on what's going on in the jail.  You know, that jail only holds 42 people.

(*Robeson depo.* 46:08.)  Put otherwise, the jail makes its decisions for protecting a mentally ill inmate based <u>not</u> on the inmate's needs, but based on other circumstances in the jail that the mentally ill inmate has nothing to do with.

20

Defendants were not following the policy manual when E Unit was used as a general population cell block.  (*Id.* 126:09.)

E Unit consists of two cells – one upstairs, one downstairs – and a dayroom.  It is undisputed that the two E Unit cells are <u>not</u> suicide-resistant.  (*Id.* 124:14.) Nor can the E Unit cells be visualized from the control center: CAMPBELL says that "staff have to go back to that area to look, visually observe them."  (*Id.* 124:22.)  WILLMS agreed that it happened that staff performing Medical Watches (like those ordered for SAMPSON) sometimes would just look through the dayroom window, instead of entering E Unit to make sure inmates were safe.  (*Willms depo.* 40:12.)

The grand jury that reviewed SAMPSON's death urged a review of the policies and procedures for dealing with medical watch inmates.  (*E37.*)  Defendant WILLMS agreed with this recommendation:

> A:    To me, in my opinion, if someone is on a suicide watch, they should be – always be able to be seen.  They should always be right there.
>
> Q:    Like in the holding cell or a safety cell?
>
> A:    Yeah.  Either – they should always be right there.  I mean, that's just my personal opinion.
>
> Q:    As you look back on this event, which I can tell has stayed with you, is that one of the lingering thoughts that you have?
>
> A:    Yeah.  It was just – you know, I'm kind of like, wish we could have …
>
> Q:    "What's the point of putting him on suicide watch if you can't see him?"
>
> A:    Kind of, yeah.

(*Willms depo.* 100:22.)

As far as ostensible proof that SAMPSON was observed in a timely manner and looked fine,

we will note that there is a meaningful difference between the Medical Watch Log (*E41*) and the Cell Check Log (*E42*.)   The Cell Check Log does <u>not</u> show, or even purport to show, that any particular inmate was observed – it is wrong to assume that "if the officer initialed the Cell Check Log, therefore he saw the inmates in that cell block." (***Campbell depo.*** 220:02.)   The Cell Check Log shows nothing except that the correctional officer signed the sheet at the door to the cell block dayroom.  (***Id.*** 219:01.)   Campbell testified:

> Q:     But [the Cell Check Log] doesn't guarantee that the inmate was seen, right?
>
> A:     Right.  That's why we have the suicide watch sheet [Medical Watch Log], to show that Troy was seen.

(***Id.*** 220:02.)

But even the Medical Watch Log is, by Defendants' admissions, not a reliable indicator of when an inmate was observed.  The Medical Watch Log for SAMPSON (*E41*) shows significant gaps when SAMPSON apparently was not observed, although he was on 30-minute suicide watch:

> *        On August 2, staff failed to check SAMPSON at 1500 hours, meaning that no one observed SAMPSON from 1430 until 1530 hours.  (***Willms depo.*** 35:22.)
>
> *        On what appears to be August 3 (the form was mislabeled as August 2 two days in a row), staff failed to check SAMPSON at 0700 hours, meaning no one observed SAMPSON from 0630 until 0730 hours.  (***Id.*** 38:11.)
>
> *        On August 4, staff failed to check SAMPSON at 0800 hours, meaning that no one observed SAMPSON from 0730 until 0830 hours.  (***Id.*** 42:11.)  On the same day, staff failed to check SAMPSON at 1430 hours (***Id.*** 43:24 - 44:04.)
>
> *        On August 5, staff gave SAMPSON a razor (***i.e.***, a potential implement of self-harm?) at 2000 hours.  Staff then failed to check on SAMPSON again until 2300 hours – six missed 30-minute watches, and three full hours without observing a suicidal inmate at all.  (***Julian depo.*** 139:01 - 09.)

      \*      On August 6, SAMPSON saw JULIAN at 1100 hours; then staff failed to observe him again until 1300 hours (**i.e.**, four missed 30-minute watches and two hours without observation); then staff missed yet another 30-minute watch at 1430 hours. (**Julian depo.** 140:01 - 04.)  Another watch was missed at 2300 hours that night.

It should be noted that immediately before we walked through this exhibit one date at a time,

JULIAN had flipped through **E41** and actually swore:

    Q:     Did the guards do a great job of watching [SAMPSON] and keeping that medical watch up?

    A:     I don't see any missed areas.

(**Id.** 138:03.)[15]  This, apparently, reflects how careful this medical professional is – JULIAN did not

notice that her staff was not following her orders for her patient in August 2006, and she had to have

that fact made painfully evident to her before she would acknowledge its truth in her deposition.  For

that matter, JULIAN has no recollection of ever looking at the Medical Watch Logs for SAMPSON

to see if her orders were being followed, at any time before this lawsuit was filed.[16]  (**Julian depo.**

142:20.)

    Nor does ROBESON, the shift supervisor on August 10, 2006.  He testified:

    Q:     Did you know that staff had not been checking him as required for –

---

[15]After the undersigned pointed out to JULIAN that she had failed to notice days of very poor compliance with 30-minute watch orders, her testimony was as follows: "Wow." (**Julian depo.** 139:09.)

[16]In a similar example of inattentiveness, JULIAN testified in her Affidavit – in support of Defendants' Motion ffor Summary Judgment – that "I check to make sure the inmate is taking the required medication and that he is stabilizing on that medication."  But at least once during his incarceration, SAMPSON did not receive his psychiatric medication from JULIAN.  (**Julian depo.** 143:08.)  JULIAN did not bring the missed medication incident to anyone's attention, and she did nothing to identify why SAMPSON had not received his medication.  (**Id.** 143:11.)

A:     Well, I don't know if they weren't checking him or if they just forgot to write it in.  I couldn't tell you.

Q:     Did you ask anybody?

A:     No, I didn't.

Q:     Even if they did check him but did not write it in, that would be a violation of policy, right?

A:     Uh-huh, yes.

Q:     So what did you do about it when you noticed – when did you notice for the first time that all these checks had been missed?

A:     I never noticed it.

Q:     Until today?

A:     Uh-huh.

Q:     As the supervisor, is this a sheet that you were supposed to look at?

A:     Uh-huh.

Q:     The medical watch sheet – do you know why it is that you had failed to notice that before it was just pointed out to you?

A:     No, I don't.

(**Robeson depo.** 27:02.)

    WILLMS acknowledges that she very well may have been the officer who failed to observe SAMPSON in some of the time-blocks that remain blank on the 30-minute watch log.  (**Id.** 44:12 - 14.)  She acknowledges that, like ROBESON and JULIAN, she did not even notice the blanks on the Medical Watch Log.  (**Id.** 42:21, 43:03.)  WILLMS does not recall saying anything to any supervisor about the blanks.  (**Id.** 43:13.)

    Moreover, even watches that were marked may have been marked falsely.  WILLMS admits

24

that she falsified the 30-minute watch log to indicate she had observed SAMPSON at 1530 hours, when in fact she had not observed him until about 1545.[17] (*Willms depo.* 73:19 - 01.)  Given that WILLMS admits to at least one falsification of the 30-minute watch log, plus numerous potential failures to timely observe SAMPSON, on what basis can we believe that WILLMS actually did observe SAMPSON in the 30-minute intervals preceding his death?

### TROY SAMPSON

A.      July 30

SAMPSON was booked into the Dodge County jail on July 30, 2006.  Although SAMPSON apparently denied suicidality during the booking process, SAMPSON's mother contacted the jail that night and reported information that should at least in theory carry significant weight in assessing risk of suicide[18]:

> Troy Sampson all booked, meds were set up for tonight.  He may ask for another Chlorpromazine, which he may have at 2330.  The meds are on the nurse's desk.  Also his mother called and advised me he attempted suicide two weeks ago – he tried to hang himself.  20 minute watch started.  Since he seems unstable mentally, leave him in booking until the nurse sees him.

(*E60.*)  This information was documented in the "pass-along book," a spiral-bound notebook used as, evidently, the only way for an outgoing shift to communicate to the incoming shift what has

---

[17]CAMPBELL, WILLMS' supervisor and the director of the jail, agrees that WILLMS falsified the medical watch log.  (*Campbell depo.* 22:18.)

[18]This fact directly impeaches CAMPBELL's affidavit testimony that "[t]here are no records that any relatives contacted DCC with concerns for Mr. Sampson's mental health or to report that he might commit suicide."  (Evidence Index in Support of Defendants' Motion for Summary Judgment on Qualified Immunity, *Campbell Affidavit* at ¶ 14.)  When confronted with the evidence in the pass-along book of Mrs. Luckert's call, and when then asked whether his affidavit testimony on this point is true or false, CAMPBELL conceded, "apparently it's false." (*Campbell depo.* 204:07.)

25

happened in the last shift.[19]

B.      July 31

The booking officer placed SAMPSON on suicide watch and ordered that staff check him every 20 minutes. According to *E41*, officers performed those checks. But sometime between 1340 and 1600 hours on July 31, apparently as a result of his medical assessment, JULIAN changed the frequency of checks to every 30 minutes. (*E46.*)

JULIAN interviewed SAMPSON and learned that he suffers from headaches. She also learned that SAMPSON took three psychotropic medications: Cymbalta, an anti-depressant; Lorazepam, an anti-anxiety drug; and Chlorpromazine, which JULIAN recognized to be an anti-psychotic. (*Julian depo.* 82:20 - 83:11.) She noted that SAMPSON had been hospitalized at the Norfolk Regional Center, an inpatient psychiatric hospital. (*E62.*) Relative to her psychiatric examination of SAMPSON, JULIAN checked "abnormal," noting:

> PTSD, psychosis, depression, anxiety attacks. Very anxious with flight of ideas.
> Tearful.

(*E62.*)

JULIAN called SAMPSON's psychiatrist. Dr. Stephen O'Neill, at the Norfolk Regional Center. JULIAN recorded in her notes that Dr. O'Neill recommended that SAMPSON should be on a suicide watch "until medically/psychologically stable." (*E46.*) Dr. O'Neill, for his part, recorded in his notes of the conversation that in response to his recommendation of keeping SAMPSON on suicide watch, JULIAN reported that the jail was "overfilled." (*O'Neill Affidavit*, Exhibit "A.")

JULIAN's notes do not mention the fact recorded in the pass-along book, that SAMPSON

---

[19]

had attempted to hang himself shortly before his arrest.  One would think that the nurse, who is ostensibly responsible for making medical decisions to protect inmate safety, would try to apprise herself of information about new inmates whom she is interviewing for medical classification purposes.  But JULIAN testifies:

> Q:    Did you know when you interviewed [SAMPSON] that his mother had called in and reported a suicide attempt?
>
> A:    I do not know or remember.[20]  I try to read the pass-on every day when I came in, so I probably did, but I don't recall that morning what I had or hadn't read.

(*Julian depo.* 93:16.)

JULIAN's deposition revealed that she presents significant witness credibility issues, so it is hard to know whether JULIAN read the pass-along book.  But it is clear that she did not document any awareness of or concern about Mrs. Luckert's information, and it does not appear from JULIAN's chart that she followed up and asked SAMPSON any questions about Mrs. Luckert's information. The note in the pass-along book stated that SAMPSON "seems unstable mentally," but JULIAN admits that she has no recollection of ever asking anyone what SAMPSON was doing or saying to warrant that description.  (*Julian depo.* 96:18 - 97:05.)

JULIAN did make two decisions regarding SAMPSON's suicidality:

\*    She left him on suicide watch; and

\*    She ordered a reduction in the frequency with which staff should observe SAMPSON, from every 20 minutes to every 30 minutes.

---

[20]JULIAN had not documented Mrs. Luckert's advisement in her chart for SAMPSON.

JULIAN did not, however, document her reasoning for these decisions.[21]

C.       August 1

JULIAN recorded notes on a form labeled "Physicians Orders," based on information provided by Dr. O'Neill.  (**E63.**)  She also received Dr. O'Neill's notes summarizing SAMPSON's psychiatric history.  The notes include:

> [SAMPSON's] diagnoses upon discharge [from the Norfolk Regional Center] were as follows: posttraumatic stress disorder; personality change, secondary to head injury with paranoid and aggressive features; cannabis dependence; personality disorder not otherwise specified with paranoid and antisocial features; history of head trauma in 1998 ... The patient was in a Mexican prison in 1998 in Juarez, Mexico across from El Paso.  The patient had been hit with a pistol and was significantly mistreated the first week or two that he was there ...

> Due to his experience in the Mexican prison, the prisoner has been very vocal about Mexicans taking away jobs from Americans.  He has been a member of the Ku Klux Klan and is suspicious of foreigners.  He has made derogatory comments about Blacks and Jews.

> *          *          *          *          *          *

> The patient's current diagnostic impression is as follows: Adjustment Disorder with Depressed Mood and Anxiety with Subsequent Worsening of Headaches; Posttraumatic Stress Disorder (from being abused in Mexican prison); Personality Change Secondary to Head Injury with Worsening of Pre-existing Antisocial and Paranoid Personality Disorder (can appear psychotic under stress); Cannabis Dependence (he likely does use to self-medicate for headaches); Personality Disorder not otherwise specified, with antisocial and paranoid features; Probable Post-Concussive Headaches, Secondary to Concession and Head Injury (from being hit with pistol in 1998).

---

[21]JULIAN's only attempt at an explanation was to state the generalization that "I've found that people who seriously want to hurt themselves aren't looking to get back on their meds to get better, so ..." (***Julian depo.*** 94:19.)  But what is her foundation for that statement?  When she assessed SAMPSON, she had been an employee of Dodge County Correctional Center for one month and had not gone through orientation.  She had had no training in suicidal risks presented by the corrections environment.  She had never worked with a suicidal inmate before SAMPSON.  (***Id.*** 64:20.)

28

(**E66.**)  The notes showed JULIAN that Dr. O'Neill had treated SAMPSON since September 2000, including hospitalizations at the Norfolk Regional Center in September 2000 (which lasted into July 2001), April 2003 and February 2005 (a two-month hospitalization) as well as a hospitalization in the federal prison system for nine months.  (**Id.**)

Dr. O'Neill also sent JULIAN his notes for his most recent evaluations of SAMPSON, which took place on July 19, July 20 and July 24.  Hence JULIAN had knowledge of SAMPSON's psychiatric history in the weeks leading up to his arrest.  On July 19, Dr. O'Neill had recorded:

> The patient reported that his head has been killing him and he needed some medicine that was going to work for him ...The patient is under investigation from his parole officer.  He reported that he had been getting along with his parole officer lately.  He is concerned about going to prison.
>
> The patient reported that he has had more headaches ...
>
> He stated that sometimes he thinks if he was not afraid of the pain, he might hang himself.  He contracted to see me tomorrow.

(**E66**, note for 7/19/06).  On July 20, Dr. O'Neill recorded:

> I called the patient's grandmother and she stated that the patient had filled out an application for a job and then left.  I questioned the grandmother whether the patient had made any statements about suicide, and she reported that he had made a statement about suicide last week sometime, but not since then.  She reported that she told him, "no girl is worth it."
>
> The patient called back between 2-2:30 p.m. and reported that I had the wrong impression ... He denied that he was suicidal or had thoughts of hurting anyone else ... He said that he feels he has a tumor.  He was informed that my experience has been that he likely has headaches associated with his trauma that is post-concussive and that are significantly worse under stress.
>
> The patient also inquired during this phone call once again about hospitalization at the Norfolk Regional Center.  I informed him that was not possible due to NRC only admitting sex offenders ...

(**E66**, note for 7/20/06.)

29

On July 24, Dr. O'Neill recorded:

[SAMPSON] is under investigation for threatening his girlfriend ... The patient is under financial duress ... The patient continues to maintain that he has a blood clot or brain tumor.  I again informed him that I felt he probably had post-concussion headaches, which are worse under stress ...

He has passing thoughts of suicide ... At this time, it appears that he has been suffering from symptoms that are exacerbated by an adjustment disorder related to further legal difficulties and a breakup with his girlfriend.

(**E66**, note for 7/24/06.)

D.      August 2

On August 2, SAMPSON submitted an Inmate Request Form reading:

Would like to be moved to "A," no window, no TV, solitary please, with phone house.  Need to see psychiatrist + counselor.

ROBESON wrote back to SAMPSON:

When something opens up where there is no TV this will be considered.  As far as the windows are concerned every cell has windows.

(**E43.**)  Keeping in mind that SAMPSON was on suicide watch and that his recent suicide attempt was known to Defendants, it is significant that there is ***no evidence*** of communication between ROBESON and JULIAN about this odd request – no evidence that anyone followed up and investigated to find out why this inmate, with a known mental illness, was asking for psychiatric help in the same kite as his request to be away from windows and television.

SAMPSON remained on suicide watch, with staff ordered to check on his safety every 30 minutes.  The Medical Watch Log for August 2, 2006 shows that no one checked him at 1500 hours.  Put otherwise, SAMPSON was unchecked for a full hour (1430 - 1530 hours).  The last correctional officer to check SAMPSON before the missed check was Defendant WILLMS, who happened to be

30

on her second day of employment and who was supposed to be still "shadowing" more experienced officers. WILLMS allows that someone should have been disciplined for missing this check. (***Willms depo.*** 38:07.) She also allows that the person who was assigned to check SAMPSON at that hour, and missed the check, may in fact have been her. (***Id.*** 35:18.) As far as Defendants' production shows, no one was disciplined in any manner for missing a suicide check; no one followed up; neither JULIAN nor any supervisor even noticed that staff had missed a suicide check.

At 9:30 that night, SAMPSON submitted a Request for Medical Care which read:

Need to see psychiatrist + counselor, asking for a room with no T.V., no window, solitary confinement with phone use + commissary, need to see nurse.

(***E43.***) The next day, JULIAN sent back her reply: "appt w/Dr. Shoiab 8/3/06."

E.      August 3

SAMPSON submitted another Request for Medical Care on August 3. This Request read:

What are these drugs you are giving me? I'd like a drug fact sheet and side effect. Wish to see nurse. No Cymbalta! Could you please get an American psychiatrist that speaks clear English or let me see my own psychiatrist.

(***E43.***) JULIAN's reply:

Inmate seen. Very "foggy." Sleeping most of day. Glassy stare. IC + Dr. Shoiab – new med orders rec'd.

It should be noted that JULIAN's reply is dated **August 7**, four days after SAMPSON submitted this Request.

SAMPSON remained on suicide watch, still under the auspice of 30-minute observations by staff. The Medical Watch Log for August 3 (***E41.***) appears to be mislabeled as August 2 (two August 2's in a row). It reveals that staff failed to perform the ordered suicide check at 0700 hours, meaning that SAMPSON apparently was not observed from 0630 until 0730. Again, as far as the

31

evidence reveals, no one followed up to find out why the suicide check was missed, and no one was disciplined in any manner for missing the suicide check. Neither JULIAN nor any supervisors appears to have even noticed that staff had now missed suicide checks two days in a row.

F.      August 5

There was a serious breakdown on August 5 in the suicide watches ordered by JULIAN. According to the Medical Watch Log (*E41*.), staff missed a suicide check at 1430 hours, meaning that SAMPSON's safety was not checked from 1400 until 1500 hours. At 2000 hours, staff gave SAMPSON a razor – and then did not check on him (or retrieve the razor so he could not use it to hurt himself?) again until 2300 hours. No one observed this suicidal inmate for three hours – which violates not only the 30-minute watches ordered by JULIAN (which are inadequate to begin with), but also the Nebraska Jail Standards requirement that inmates be observed at least once every hour.

Once again, no one noticed this breach. No one followed up. No one communicated. No one disciplined. No one did anything, as far as Defendants' production indicates.

In the hours when staff did observe SAMPSON on August 5, he was observed more often than not to be sleeping and/or in his bed.

G.      August 6

The staff was scarcely any better about observing their one and only suicidal inmate on August 6. The Medical Watch Log (*E41*) indicates that no one observed SAMPSON at 1130, 1200 and 1230 hours, and then staff missed the 1430 hours check as well – for a total of two and a half hours of missed checks. For the hours when staff did check SAMPSON on August 6, most observed him to be lying down or appearing to be asleep.

On the same day, SAMPSON submitted a Request for Medical Care reading:

32

Need to be transferred to Norfolk Regional Center to Dr. Stephen O'Neill or I will die in here.  My head is killing me.  These meds are making me sick + confused.

(**E69.**)  The next day (the same day that she replied to SAMPSON's August 3 Request for Medical Care), JULIAN replied:

These are the medications Dr. Shoiab ordered for you.  It will take a week or 2 before you don't have side effects from them.

(**Id.**)

## H.      August 7

The Medical Watch Log lists two August 6's in a row, which probably indicates that the second "August 6" is actually the log for August 7.  On this day, staff managed to document all of the 30-minute watches except 2300 hours (the blank for which actually appears on the August 8 log).  According to the comments of the staff who documented watches, SAMPSON appeared to be asleep for most of the day.

On the same day, August 7, SAMPSON submitted a "kite," or Inmate Request Form.  (**E43.**) In that Inmate Request Form, SAMPSON asked for a safety cell.  He wrote:

Lt. or Sargent Lefler, I'd like to be "moved" to "solitary confinement" or safety cell. "No T.V." No cellmate ASAP.  The T.V. makes me go crazy please move me for the last time.  I'm gonna loose it, no T.V. please!

ROBESON responded:

The safety cell cannot be at this time.  When something opens up, we will try to move you.

SAMPSON was never placed into a safety cell or any functional equivalent.  As with SAMPSON's previous peculiar requests, there is no evidence that ROBESON communicated with JULIAN, or with Dr. Shoiab, or with anyone about SAMPSON's peculiar and urgent request of August 7.

And, no one ever followed up to communicate with SAMPSON to ask him why he felt

33

unsafe.  JULIAN, the nurse, consistent with her pattern in her deposition, first tried to pretend

SAMPSON never expressed safety concerns and then (when confronted yet again with evidence that

her account was inaccurate), equivocated:

> Q:     What do you do for an inmate who needs safety when there is no safety cell available?
>
> A:     If there are indications that they need hospitalization, obviously we'll send them to the hospital.  If I feel that they need to go see the doctor, they'll see the doctor.  If either the doctor or I feel that they're in imminent danger, then we would transfer them somewhere else because our safety cell wasn't operational at that time.
>
> Q:     Would you talk to the inmate to try to find out why he feels unsafe and why he's asking for a safety cell?
>
> A:     I don't know that [SAMPSON] actually said that he was unsafe.  He said he wanted a different cell.
>
> Q:     [SAMPSON] asked for a safety cell, did he not, in one of his medical requests?
>
> A:     I don't remember.  I don't recall.
>
> Q:     Well, let's look.  It's his request of ...
>
> A:     A medical request?
>
> Q:     It's August – it's in the inmate request forms.  It's [**E43**] ... On August 7, 2006, in his inmate request form, [SAMPSON] asked for solitary confinement or a safety cell.
>
> A:     This form did not come to me.
>
> Q:     Did anyone make ...
>
> A:     I was not told about this form.

(**Julian depo.** 149:06.)    Whether JULIAN is not telling the truth about receiving notice of

SAMPSON's request for safety[22] or, alternatively, there was another breakdown in communications among staff, either way the plan JULIAN claims she implements for inmate safety was not implemented. No one followed up to see if SAMPSON needed to go to a hospital or a doctor; no one followed up to see if SAMPSON was in imminent danger; and no one followed up to see if SAMPSON should be transferred to a jail whose safety cell was not broken.

It happens that SAMPSON did contact JULIAN directly, and asked for a safety cell, the same day, at 3:30 p.m. His Request for Medical Care reads:

> Please move me to safety cell or solitary confinement "NO TV." I wish to be alone. No cellmate. Please move me.

In other words, even if JULIAN did not see the kite SAMPSON submitted to ROBESON, she is lying when she says he never asked for safety – he asked JULIAN directly. Her reply, on August 8, was:

> No cells like that available. Sorry, we are full.

(**E69.**) She did not follow up – no communication with SAMPSON (although she knew him to be suicidal enough to be on suicide watch), no communication with other jail personnel.

Later the same day, SAMPSON wrote yet another kite, apparently trying to go over JULIAN's head:

> Dr. Mohamed please put me in isolation with no TV by myself. The TV is making me insane. Put me in solitary confinement ASAP please. Need medication Adderall XL, Haladon.

(**E43.**) In reply (the next day), JULIAN wrote: "See previous response" on August 8. There is no evidence that she followed up in response to any of SAMPSON's requests, or ever talked to

---

[22]Which is entirely possible – JULIAN, like CAMPBELL, has problems with the truth.

SAMPSON about why he was so frantic for a safety cell with no television.  There is no evidence that JULIAN communicated to other jail personnel that SAMPSON, an inmate on suicide watch, was sending out multiple and increasingly urgent requests for safety cells with no television.

I.      August 8

On August 8, Defendants transported SAMPSON to Dodge County Court for an 8:30 a.m. hearing.  (*E41*.)  The purpose of the hearing was to review SAMPSON's bond.  SAMPSON was escorted to and from the jail by Sheila Cassatt, a Dodge County correctional officer.  (*Willms depo.* 48:10.)  The hearing featured the following discourse:

> The Court:     Mr. Keith [special prosecutor], I'm inclined to review Mr. Sampson's bond, review his request for court-appointed counsel, and continue this matter and allow him to consult with counsel before we proceed any further.  Is that acceptable, Mr. Sampson?
>
> SAMPSON:     Yes, your Honor.  I also would like to say I've been trying to get into the Norfolk Regional Center before this happened, and they were full, and then I went every recourse to try to get help and it seems like every door was shut in my face.
>
> *         *         *         *         *         *
>
> SAMPSON:     Your Honor, if I may –
>
> The Court:     Consult with your attorney before you speak.
>
> SAMPSON:     My friend sent some flowers to her house.  That's how I got violated for that, and he told the police department that.  This is ridiculous.  Send me to the Regional Center, man.  This is a joke.

(*Transcript of August 8, 2006 bond review hearing*.)  This request for psychiatric treatment came two days before SAMPSON's death.

CAMPBELL testified:

Q:      If an inmate says or does something unusual during a court transport, do you

36

> expect the corrections staff person that's escorting them to make a note of that?
>
> A:     Yes.
>
> Q:     And to advise other shifts?
>
> A:     Yes.
>
> Q:     And to advise their shift supervisor?
>
> A:     Yes.
>
> Q:     How should that be documented if an inmate does or says something out of the ordinary during a court transport?
>
> A:     Normally it would be documented on an investigative report.

(*Campbell depo.* 152:21.)  There is no evidence that Sheila Cashatt, the correctional officer who escorted SAMPSON to court (*Willms depo.* 48:10.), ever told anyone of SAMPSON's comments at court.  There is no evidence that Cashatt documented SAMPSON's comments on an investigative report.

That would appear to violate the policy described by CAMPBELL above.  It is notable, in a case where inadequate training is alleged, that the policy described by CAMPBELL does not appear in the Dodge County Policy & Procedure Manual (*E52*).  Nor does it appear in any of the suicide prevention training materials produced by the defense.  If CAMPBELL is telling the truth and this is a Dodge County policy, there is **no evidence** that Dodge County trains its employees, other than CAMPBELL, in that policy at all.

SAMPSON sent another Request for Medical Care on August 8, asking:

> Would like to see Dr. Shoiab Mohammed on Thursday.

(*E69.*)  JULIAN replied, on August 9, "you have an upcoming appt with Dr. Shoiab scheduled."

There is no evidence that JULIAN followed up to investigate.

J.    August 10

Early on the morning of August 10, SAMPSON was seen by Dr. Shoiab.  In the late morning of August 10, SAMPSON attended an inmate Bible study.  The Bible study was facilitated by Larry Juedes, a well-intended volunteer and lay minister who is not ordained as a pastor and has no training in mental health issues.  (*Juedes depo.* 09:15.)  Juedes has volunteered at the jail for over 20 years (*Id.* 05:16.) – meaning the jail has had the benefit of Juedes' generosity to provide spiritual services free of charge, and has not had to employ a professional chaplain.  (*Id.* 13 - 20.)  Juedes acknowledges that the jail expects him to honor the rules of the jail as a condition of his access to inmates.  (*Id.* 35:19.)

DCDC has not, in the 20+ years of Juedes' ministry, oriented or trained Juedes in jail policies and procedures.  (*Id.* 09:22 - 11.)  Juedes has never seen Policy 12.4 or any other policy in the Dodge County Corrections Policy & Procedure Manual.  (*Id.* 14:10 - 15:03.)  Nor had the jail ever taught Juedes how to identify suicidal inmates or what to do if an inmate expressed suicidal thoughts in Juedes' Bible study.  (*Id.* 15:17.)

Juedes had had only brief conversations with SAMPSON before his death ("very, very brief" in his words).  (*Id.* 27:14.)  On August 10, the subject of suicide arose during Juedes' Bible study, on the comment of another inmate.  The other inmate had asked whether suicide is an unpardonable sin, and how one asks for forgiveness after suicide.  (*Id.* 29:15 - 24.)  Juedes' response was well-intended, but was not a response that reflects training in mental health issues:

Q:    So what was your reaction?

A:    Well, again, just that, you know, don't do it.  That's – I mean, that's not the

38

answer.  I don't ever – you know, I've stressed pretty hard that it's not acceptable and that it is murder.  The Bible says thou shalt not kill, so …

(*Id.* 31:07 - 13.)  Then:

Q:     It sounds like one inmate brought it up and it sounds like [SAMPSON] had a comment.  Any other inmates?

A:     [SAMPSON] just looked over at me and he said, well, we've all thought – I mean, it was just in such a light – you know, lighthearted way he said it.  He said, well, we've all thought about it at least once in our life or something like that.  And then it was – you know, I didn't think anything of it.  I mean, you know, I mean, I don't know.  I just didn't connect that he was thinking about it.  I mean, now if somebody said that to me, because of that I would say something to the guard[23], but at the time it just didn't trigger any response from me.

(*Id.* 31:20 - 32:11.)  And so Juedes – allowed to minister to inmates only on permission from the jail, but untrained by the jail – told no one of SAMPSON's comments.  Hence no one followed up; no one asked SAMPSON what he was thinking or how he was feeling.  There is no evidence that any jail personnel had ever advised Juedes that SAMPSON was on a suicide watch, such that Juedes might have recognized the significance of an inmate who is on suicide watch talking of suicide.

At any rate, Bible study ended at 2:30, and SAMPSON returned to his cell in E Unit.

As previously noted, August 10 was WILLMS' tenth day on the job, and her first day of working the floor on her own without shadowing a more experienced officer.  She had been scheduled to work the 3:00 - 11:00 p.m. shift that day.  (***Willms depo.*** 53:14.)  However, she reported to work early to help ROBESON transport an inmate to Platte County, leaving Fremont

---

[23]After SAMPSON's death, Juedes began telling correctional officers if he had concerns that inmates were at risk of suicide.  (*Id.* 15:20 - 16:15.)

39

at 12:45 p.m.[24]  (**Id.** 45:17.)

WILLMS returned from the transport assignment between 3:30 and 3:45 p.m.  (**Willms depo.** 53:07.)  The 3:00 - 11:00 shift had already started (**Id.** 53:11.) and, due to her assistance with the transport, WILLMS had missed the shift-change meeting.  (**Id.** 54:17.)  As to what information was given WILLMS since she missed the shift-change meeting, WILLMS testified:

> Q:  How did you learn what had happened in the day before, since you weren't back from the transport in time for the shift meeting?
>
> A:  I don't recall.
>
> Q:  Do you remember being told anything in particular that day about, you know, here's what to look for, here's what to bring to your attention, stuff like that?
>
> A:  No.

(**Id.** 54:20.)  ROBESON assigned WILLMS to be the "on the floor escort" (**Id.** 52:05.), meaning that she would be responsible for checking on inmates in their cell blocks.  The other officer whom ROBESON assigned to work the floor that day was CHILES.

CHILES was late to work that day.  (**Id.** 51:09.)  WILLMS does not recall whether anyone stayed late from the previous shift to cover CHILES, or if she was working the floor alone.  (**Id.** 51:09 - 15.)  WILLMS does not recall anyone telling her, "here is what we'll do until CHILES gets here," or otherwise formulating a contingency plan to deal with the latest episode of CHILES' habitual tardiness.  (**Id.** 51:20.)

At the booking counter, WILLMS looked at SAMPSON's Medical Watch Log and noticed that the time of 1530 hours had come and gone, without anyone performing a suicide watch on

---

[24]The reason for the transport was that the jail was full, "and when we get full, we have to find other facilities to house our inmates."  (**Willms depo.** 46:05.)

SAMPSON for that time increment.  (*Id.* 58:01.)  WILLMS walked to E Unit and "checked on

him," signing the 1530 time slot on SAMPSON's Medical Watch Log at a time as late as 1545.  (*Id.*

58:10.)[25]  She did not bring to anyone's attention the fact that staff had missed SAMPSON's suicide

watch for the 1530 time slot.  (*Id.* 68:16.)

WILLMS knew that SAMPSON was on not just a medical watch, but specifically a suicide

watch.  (*Id.* 64:12.)  She was unaware of SAMPSON's behaviors over the preceding week and did

not know about the comments he had made in his "kites."  (*Id.* 65:03.)  She knew he took

medication.  (*Id.* 65:17.)  She says she walked into the E Unit dayroom and observed SAMPSON

through the window of his cell door.  (*Id.* 59:18.)  SAMPSON's cell door was locked, and she did

not open the door or communicate with him.  (*Id.* 60:07.)  Since WILLMS saw SAMPSON

sometime in the whereabouts of 1545, well more than 30 minutes had passed since his last designated

watch (assuming that whomever signed his Medical Watch Log at 1500 hours did so honestly).

At some point thereafter, CHILES reported for work.  CHILES and WILLMS met up, briefly,

in the booking area.  (*Id.* 70:23.)  They then separated to perform "hour rounds," which on the hour

(not on the half-hour) is essentially a head count of the inmates.  (*Id.* 71:08.)  At 1600 hours (4:00),

CHILES did not actually enter the dayroom, but says that he saw SAMPSON from the doorway of

the dayroom, glancing into the window of SAMPSON's cell.  (***Chiles depo.*** 66:20.)  He testified:

---

[25]WILLMS agrees that she falsified the record by marking that she had observed
SAMPSON at 1530 hours when in fact she had not.  (***Willms depo.*** 73:25.)  She testified:

    Q:    Could you have just scribbled in "45" over the "30" so that people knew
           that it was a little late?

    A:    Yeah, but I didn't think about that.

    Q:    Did anyone ever talk to you about it one way or the other?

    A:    No.

(***Id.*** 74:02.)

> Q:     So you entered the unit, or did you just look through the [dayroom] window?
>
> A:     Um, I entered the – no, I just visual – I seen them.

(**Id.** 66:20.) CHILES has no memory of whether SAMPSON was under the covers, or whether he was doing anything in particular.  (**Id.** 67:03 - 17.)  He did not communicate with SAMPSON.

According to WILLMS, she returned to booking and met up again with CHILES at about 1605 (4:05 p.m.).  (**Willms depo.** 74:21.)  She asked CHILES if he had conducted a suicide watch on SAMPSON as long as he was signing the Cell Check Log at E Unit; CHILES said "no."  (**Willms** 74:13.)  Put otherwise, DCDC staff was once again missing the designated 30-minute watches for an inmate on suicide watch.  WILLMS testifies:

> Q:     Why do you think that there were two checks in a row that weren't getting done?  Was it really busy that day?  Were people overwhelmed?
>
> A:     Probably lack of communication.
>
> Q:     Tell me what you mean by that.
>
> A:     Well, maybe if Chiles and myself had been at the – I don't know what to call it, the debriefing session at the … beginning of the shift, maybe, you know, we would have been more aware that SAMPSON was on his suicide watch still …

(**Willms depo.** 75:04.)  WILLMS returned to E Unit and looked at SAMPSON through the window of his cell door.  She did not talk to anyone in E Unit (**Id.** 77:08.), including SAMPSON.  She returned to booking and signed the Medical Watch Log for 1600 hours.

WILLMS returned to E Unit again at 1626, but did not enter E Unit, look through the dayroom window at the cells, look for or count inmates, or communicate with anyone.  All WILLMS did was "sign the door."  (**Id.** 80:21.)  She has no memory of looking into the room, seeing SAMPSON at all, or seeing the other inmate who was housed in the other E unit cell.  (**Id.** 81:08.)

42

She was working alone:

Q:     Was there any time on August 10th, up to when you started performing CPR,
or when you found SAMPSON – was there any time up to then where you
were actually with CHILES, doing some responsibility together?

A:     No.

Q:     Was there any point on that day where you were checking back with any
supervisors or officers who had more experience than you, when they would
be telling you what to do or how to do it or anything like that?

A:     No.

Q:     If I'm understanding you correctly, up to the time when you found
SAMPSON, you were pretty much on your own that day?

A:     Correct.

(*Id.* 82:01.)

At about 1635 (4:35 p.m.), WILLMS returned to E Unit so that she could hand out meal

trays. An inmate trustee assisted her. The procedure is that inmates come to the dayroom door, and

the guard takes trays from the trustee and hands them to the inmates in the unit – guards do not

ordinarily enter the unit during meal passes. (*Id.* 83:01.) At E Unit, the other inmate housed in that

cellblock was at the dayroom door to take his tray (*Id.* 84:08.), but SAMPSON was not. WILLMS

called for SAMPSON. When SAMPSON didn't answer, WILLMS entered the dayroom and walked

to SAMPSON's cell. When she pushed SAMPSON's door open, she found SAMPSON hanging.

(*Id.* 86:03.)

### A Final Note on Defendants' Credibility

Some motions for summary judgment based on qualified immunity are akin to a motion to

dismiss brought under FED. R. CIV. P. 12(b)(6) – presenting primarily a question of law, such as

43

whether the right alleged to be violated was "clearly established" at the time of the violation. Other motions, however, are more akin to a traditional full-scale motion for summary judgment. This Motion falls into the latter category: it was presented with affidavit testimony which included the affiants' conclusions as to their good faith, their adherence to policy, and various other claims of constitutional significance.

All of the affiants' conclusions require a truthful factual foundation. Depositions, however, revealed that some of the affiants were not especially truthful in their affidavit testimony.

<u>CAMPBELL</u>

CAMPBELL, the jail administrator and thus the **policymaker** for Dodge County Corrections, admitted that many points of his affidavit testimony are simply false. For example, CAMPBELL testified in his affidavit that "[t]here are no records that any relatives contacted DCC with concerns for Mr. Sampson's mental health or to report that he might commit suicide." (Evidence Index in Support of Defendants' Motion for Summary Judgment on Qualified Immunity, *Campbell Affidavit* at ¶ 14.) This is so untrue, and was so easy to disprove, that it is not clear why CAMPBELL would choose to include this statement in his sworn testimony. The pass-along book, *E60*, contains an entry for the first day of SAMPSON's incarceration which reads: "His mother had called and advised me he attempted suicide two weeks ago. He tried to hang himself."

It would be one thing if CAMPBELL never said anything in his affidavit testimony on the issue of whether SAMPSON's relatives advised the jail of SAMPSON's illness, or if he simply said he couldn't remember. It is quite another thing when CAMPBELL elects to affirmatively lie to this Court by claiming, in statements designed to persuade this Court to dismiss this case, that "[t]here are no records that any relatives contacted DCC with concerns for Mr. Sampson's mental health or to report that he might commit suicide." **Had the undersigned not reviewed the documents produced by Defendants and read the pass-along book, this false statement would have stood unchallenged.**

CAMPBELL also lied when he testified in his affidavit that "with respect to the plaintiff's claim that the grand jury had issued recommendations for suicide prevention procedure and training prior to Troy Sampson's suicide that were not implemented by the county, the plaintiff cannot support this claim with any documents whatsoever." (*Campbell Affidavit* at ¶ 10.) That claim was easily

disproven with *E51,* a newspaper article that directly impeached CAMPBELL by proving that grand juries *had* issued recommendations for suicide prevention and training before SAMPSON's death, and the county *had not* implemented the recommendations.  Confronted with *E51* and forced to admit that he had not implemented the 2001 grand jury's recommendations, CAMPBELL eventually admitted that ¶ 10 of his affidavit was false.  (*Campbell depo.* 37:22.)

An especially egregious lie is CAMPBELL's affidavit testimony that "with respect to plaintiff's claim that defendant had a custom or practice of tolerating misconduct by employees, there are absolutely no documents to substantiate this allegation." (*Campbell Affidavit* at ¶ 9.)  That claim was impeached by CHILES' personnel file – after we litigated the issue of whether we could discover CHILES' personnel file before this Motion went under advisement.  CHILES' personnel file, *E7,* shows that CAMPBELL, as the policymaker for Dodge County Department of Corrections, absolutely tolerated misconduct by employees.  CAMPBELL has kept[26] CHILES on county payroll in spite of 26 written reprimands and suspensions in four years. CHILES' misconduct includes habitual tardiness, fighting with inmates, losing track of keys (which would seem to be a concern in a jail), disobeying direct orders to medicate inmates, not securing inmates and nearly everything else one could imagine ... and CAMPBELL has tolerated it.  (*Campbell depo.* 170 - 185.)  CAMPBELL has also tolerated ROBESON providing false information (*Id.* 187:16 - 20.)

We asked in written discovery requests for copies of all press releases or other communications with the media relating to SAMPSON; Defendants responded, "none."  That, too, was false, and was disproven by newspaper articles readily available on the internet.  (*Campbell depo.* 92:08.)  **We had to spend substantial money and time, and beg for leave to spend that money and time in discovery, in order to show that the affidavit testimony was false**.  It should not be this way – the rule shouldn't be "you can lie in your affidavit unless you are caught"; it should be "tell the truth regardless of whether you think the plaintiff's lawyer will catch you."

So, does anyone – including this Court –  care?

<u>JULIAN</u>

For example, JULIAN tried to argue that the DCDC officers had complied with her orders for suicide watches, and that she always brings missed watches to the shift supervisor's attention.  (*Julian depo.* 140:08.)  As she glanced through *E41*, she said "I don't see any missed areas" (meaning any missed 30-minute suicide watches).  (*Id.* 138:06.)  Did she not think that the undersigned would take the time to actually read

---

[26]CHILES remains employed by Dodge County to this day.

the Medical Watch Log and see the obvious "missed areas" where no officer has shown that he/she observed SAMPSON?  This testimony shows that either JULIAN is very careless or JULIAN is mendacious.  Neither interpretation is good for protection of inmates' constitutional rights.

JULIAN made a weak, false claim that SAMPSON had not discussed suicide with Dr. O'Neill (who sent her his notes for his recent visits with SAMPSON).  Asked about a comment in O'Neill's note for July 19, 2006 that SAMPSON "contracted to see me tomorrow," JULIAN's answer was, "I didn't read that he contracted – he didn't do a suicide contract.  He contracted to see [Dr. O'Neill.]" (*Julian depo.* 153:13.)  For heaven's sake, the preceding sentence in that note reads, "he thinks if he was not afraid of the pain, he might hang himself." (*E66,* note for 7/19/06.)  For JULIAN to deny that suicide was a concern for Dr. O'Neill on July 19, 2006 indicates either that JULIAN does not understand what statements and behaviors of suicidality inform risk assessment, or else that she is a liar who hopes no one will read jail documents and records carefully enough to disprove her statements.

JULIAN also lied when she testified that SAMPSON never requested safety. (*Julian depo.* 149:06.)  *E69* impeaches that false testimony, revealing JULIAN's own handwriting in response to SAMPSON's request for a safety cell on August 7, 2006. She knew damn well that SAMPSON was asking for safety – and she never followed up to ask why, and never communicated SAMPSON's requests to other jail staff. This may explain her decision to falsely testify that SAMPSON never asked for a safety cell, but it does not justify that decision.

## ARGUMENT

### Standard of Review

Summary judgment is appropriate only when no genuine issue of material fact exists, and where the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c.  Whether a given set of facts entitles an official to summary judgment on qualified immunity grounds is a question of law.  But:

If there is a genuine dispute concerning predicate facts material to the qualified immunity issue, there can be no summary judgment.

*Olson v. Bloomberg*, 339 F.3d 730, 735 (8th Cir. 2003).  The evidence submitted in support of and in opposition to a motion for summary judgment based on qualified immunity must be viewed in the

46

light most favorable to the plaintiff. *Turney v. Waterbury*, 375 F.3d 756, 760 (8ᵗʰ Cir. 2004).

An official is entitled to summary judgment on the ground of qualified immunity, unless the plaintiff establishes that the official's conduct violated the plaintiff's clearly established constitutional rights. *Coleman v. Parkman*, 349 F.3d 534, 537-38 (8ᵗʰ Cir. 2003). The violation cannot be established merely by the deprivation of a constitutional right: the plaintiff must also show that the official knew such action amounted to a constitutional violation. *Yellow Horse v. Pennington County*, 225 F.3d 923, 926 (8ᵗʰ Cir. 2000). To prove such knowledge in the context of jail suicide, the United States Court of Appeals for the Eighth Circuit has held that a plaintiff must show that the official was deliberately indifferent to a known risk of suicide. *Id.*; *see also Coleman*, 349 F.3d at 538 ("The Eighth Amendment prohibits officials from acting with deliberate indifference toward an inmate's substantial suicide risk, and the Fourteenth Amendment extends at least as much protection to pretrial detainees ...").

We would hope that all parties can agree that SAMPSON enjoyed a clearly established constitutional right to be protected from the risk of suicide. The question presented by Defendants' Motion is whether Dodge County, CAMPBELL, JULIAN, WILLMS and CHILES knew of that risk and were deliberately indifferent to it. *See Turney, supra,* 375 F.3d 756, 760 (jail suicide of pretrial detainee) (*citing Coleman*, 349 F.3d at 538 ("Once an official knows of a risk, the Eighth Amendment requires the official take reasonable measures to abate the risk").

## I.

The due process clause guarantees a pretrial detainee the right to adequate medical care, at least where the state's failure to provide such care would amount to deliberate indifference to a

47

serious medical need. *Martin v. Gentile*, 849 F.2d 863, 871 (4th Cir. 1988) (noting that the precise scope of the pretrial detainee's right to medical care is uncertain but is at least as great as a convicted prisoner's Eighth Amendment right under *Estelle v. Gamble* to be free from deliberate indifference to serious medical needs). A serious impairment can qualify as such a medical need. *Greason v. Kemp*, 891 F.2d 829 (11th Cir. 1990). When law enforcement knows that a pretrial detainee is suicidal, "that psychological condition can constitute the kind of serious medical need to which government officials must, under the due process clause, not be deliberately indifferent." *Buffington v. Baltimore Cty., Md.*, 913 F.3d 113, 120 (4th Cir. 1990).

*Turney v. Waterbury*, 375 F.3d 756 (8th Cir. 2004), was brought by the mother of an inmate who died in custody by suicide. She sued the state and the county, the sheriff's office, the sheriff and a deputy, and a jailer. All defendants moved for summary judgment on the basis of qualified immunity. The district court sustained the motion, and the plaintiff appealed.

Upon his admission to the Bennett County (South Dakota) jail, the decedent had become belligerent and violent. Based on the decedent's behavior, the sheriff decided to transfer the decedent to the Pennington County jail in Rapid City. On October 23, 2001, while at the Pennington County jail, the decedent informed a jailer that he was "going to hang it up." Pennington County jailers thereafter averted the decedent in a suicide attempt. *Id.* at 758. The Pennington County personnel maintained the decedent on a suicide watch until October 23, 2001, when the decedent was transferred back to the Bennett County jail, by a deputy Bennett County sheriff, in anticipation of a hearing in his criminal case.

When the deputy Bennett County sheriff picked up the decedent for the transfer, the Pennington County jail staff informed him of the suicide attempt of three days earlier. The deputy

48

relayed this information to the defendant sheriff upon arrival at the Bennett County jail. The deputy also told the defendant sheriff that during the drive back to Bennett County, the decedent had said that if he received a sentence of more than 15 years, he would die and take someone with him. **Id.** [27] In response, the defendant sheriff did what the agents and employees of Dodge County did in this case in response to SAMPSON's requests for help: **nothing**. The defendant sheriff neither followed up by contacting Pennington County for details, nor communicated what he knew to anyone else. **Id.**

The intake form used by the Bennett County jail requires the admitting jailer to ask the inmate if he has ever attempted suicide. The jailer on duty did not complete the intake form because the defendant sheriff took the decedent directly to an isolated cell, ostensibly because he was afraid the decedent would try to hold someone hostage. **Id.** When he left the jail, the defendant sheriff told the jailer to keep an eye on the decedent and perform ten-minute checks; but the sheriff did not tell the jailer that the decedent had tried to kill himself three days earlier. **Id.** at 759. The sheriff also did not communicate to his deputies the limited instructions he had given the jailer – again, a failure of communication like the failures of communication observed in this case. Consequently, the jailer and the chief deputy did not know of the decedent's very recent suicide attempt; and, the chief deputy did not know that the decedent was on a ten-minute watch. Bereft of that information, the chief deputy left. Thereafter, the decedent hung himself, tying a noose to the ceiling bars of his cell.

---

[27]As it happened, the decedent's lawyer had reached a plea agreement that would require the decedent to serve a prison sentence of 15 years. It was widely known that the decedent had provided information on a prison killing, and there was a real chance that the decedent would be subject to retaliation upon returning to prison. **Id.**

The case against the sheriff, like Plaintiff's case against the Defendants in this case, turned on the knowledge held by the defendant and what the defendant did (or failed to do) with that knowledge. In *Turney*, the defendant sheriff knew that the decedent was volatile and had attempted suicide while in the custody of Pennington County. Yet, armed with that knowledge, the sheriff:

    \*      Failed to follow up and investigate the previous suicide attempt;

    \*      Skipped a step of the jail intake process in which suicidality would have been addressed;

    \*      Placed the decedent in an isolated cell with a bed sheet and exposed ceiling bars;

    \*      Failed to tell the jailer that the decedent was a suicide risk; and

    \*      Failed to tell the on-duty deputy sheriff that the decedent was a suicide risk.

*Id.* at 760-61. The United States Court of Appeals for the Eighth Circuit held that those facts "are facts which exhibit deliberate indifference," and reversed the order granting the sheriff's motion for summary judgment based on qualified immunity.

What justified qualified immunity for the deputy sheriff and jailer of *Turney* was the very fact that disqualified the sheriff from eligibility for qualified immunity – *e.g.*, the sheriff did not tell the deputy and the jailer that the decedent was suicidal. *Id.* at 761-72. He told the deputy and the jailer to watch the decedent closely, but did not say why: "We fail to see how telling [the deputy] to closely watch an inmate could alert [the deputy] that [the decedent] was suicidal." Because the deputy and the jailer did not know that the decedent presented a suicide risk at all, they therefore could not have acted with deliberate indifference toward that risk. *Id.*

But **JULIAN, CAMPBELL, WILLMS, ROBESON and CHILES did know that SAMPSON presented a suicide risk**. All Defendants knew that SAMPSON was on suicide watch

50

on August 10, 2006 (and for ten days preceding, never removed from suicide watch at any time).
Knowing from past history that a suicidal inmate can hang a noose from an air vent, Defendants
nonetheless placed SAMPSON in a cell with an air vent and a sheet and then checked him no more
often than every thirty minutes, and on many occasions less frequently than that.

* Knowing that inmates could use air vents to commit suicide by hanging, CAMPBELL never covered the air vents until after the suicide following SAMPSON's. He never followed any of the recommendations of the 2001 grand jury following inmate Darrough's suicide. Although he had access to suicide prevention training materials, CAMPBELL appears to have administered **zero training** in suicide prevention from February 2005 until after SAMPSON's death, in spite of 22 suicide attempts (four successful) between 2000 and 2006. For August 10, 2005, CAMPBELL staffed his jail with a nurse who had no training in suicide prevention, a correctional officer who had no training in suicide prevention and a more senior officer who was habitually unable to show up to work and had been disciplined 26 times in four years. CAMPBELL tolerated haphazard communication between his employees on the literally life-or-death issue of suicide prevention; he tolerated missed suicide watches; he tolerated missed medication administration. He failed to implement any policies, or train his employees, regarding the importance of communicating to other employees when an inmate says or does unusual things at court. The evidence of CAMPBELL's indifference to suicide prevention is the answer to the question, "why were there 22 suicide attempts and four successes at the Dodge County jail in just six years?"

* Although JULIAN knew SAMPSON had reported suicidal thoughts to Dr. O'Neill, she reduced the frequency of his watches from every 20 to every 30 minutes for no apparent reason; she failed to read the Medical Watch Log to see if the watches she ordered were being carried out; she failed to review the pass-along book in which SAMPSON's recent hanging attempt was recorded (although she says that it is ordinarily part of her job to read the pass-along book – apparently just not with respect to SAMPSON); she never followed up or investigated the peculiar requests in SAMPSON's Medical Request Forms. She waited four days to respond to SAMPSON at all when SAMPSON sent her a frantic request for medical help. She completely, and unapologetically, failed to follow Policy 12.4's requirements that she conduct and document a daily written assessment of the condition of every suicidal inmate, including SAMPSON. *See, e.g., Owens v. City of Philadelphia*, 6 F. Supp.2d 373 (E.D. Pa. 1998) (holding that jail employee's failure to follow

51

operative suicide prevention policy raised questions of fact precluding summary judgment on employee's request for qualified immunity). In summation, this woman never took the risk of suicide seriously. JULIAN, in her pre-DCC employment, worked as an insurance case manager whose primary task was to find reasons to refuse services requested by insureds – it appears she took the skills developed at that job to DCC and put them to use on SAMPSON.

*   CHILES knew that his habitual tardiness caused safety concerns in terms of coverage of work responsibilities at the jail. He had been told repeatedly to quit showing up late. Still, he was late to work on August 10 and never quite figured out that SAMPSON needed suicide watches (as he performed none of SAMPSON's suicide watches that day). He knew SAMPSON was suicidal and knew WILLMS was inexperienced, yet did nothing to guide WILLMS on August 10, 2006 in terms of performing suicide watches.

*   WILLMS admits that she may have missed multiple suicide watches on SAMPSON in the week before his death. She admits that she falsified her documentation of SAMPSON's 1530 hours watch.

*   ROBESON, a shift supervisor, tolerated haphazard communication between his subordinates on the literally life-or-death issue of suicide prevention; he tolerated missed suicide watches; he tolerated missed medication administration. He never followed up or investigated those breaches, and he never followed up or investigated SAMPSON's peculiar requests and kites, although he knew SAMPSON to be mentally ill and suicidal.

Each of these Defendants knew the jail was a dangerous condition for mentally ill and suicidal inmates, and each of these Defendants knew that SAMPSON was a mentally ill and suicidal inmate. Instead of ramping up the level of care to prevent their one and only suicidal inmate from taking his own life, Defendants spent 10 days dismissing and ignoring SAMPSON and dismissing and ignoring the risk of inmate suicide. Under *Turney*, it is deliberate indifference to have so much knowledge, and yet take so little care in response to that knowledge.

In the jail suicide case of ***Matis v. Johnson***, 2008 WL 248556 (5th Cir. 2008), the record showed that a jail nurse knew that the decedent took psychotropic medication for bipolar disorder.

She did not place the inmate on suicide watch or follow up and ask questions about his condition and prior suicide attempts. The inmate's father had told arresting officers that the inmate was suicidal. The nurse testified, much like JULIAN in her affidavit, that the decedent appeared to be happy and that she did not observe any signs of distress that would indicate that he was suicidal – which conflicted with evidence in the record that the decedent was upset and fidgety and showed signs of self-mutilation. *Id.* at **2.

The district court rejected the nurse's claim that she was entitled to qualified immunity. It observed that the nurse's knowledge that the inmate took psychotropic medication for bipolar disorder, and the evidence of self-mutilation "tend to contradict [the nurse's] claim that [the inmate] appeared happy." The nurse filed an interlocutory appeal. Reviewing the district court's findings, the United States Court of Appeals for the Fifth Circuit noted that

> the district court found a fact issue as to the defendant's subjective state of mind. *See Farmer v. Brennan*, 511 U.S. 825, 847 (1994) (noting that a prison official's subjective state of mind is a question of fact). As noted above, we do not have jurisdiction to review the district court's assessment regarding the sufficiency of the evidence. We may consider only whether the factual issues are material to the qualified immunity analysis. We conclude that Johnson's knowledge of Wajda's demeanor, physical condition and prior suicide attempt, and her reasons for failing to complete the intake form required by the policy manual, present material issues as to her actual knowledge of Wajda's suicidal tendencies. The district court did not err in assessing the legal significance of the evidence.

*Id.* at **3. On those findings, the Fifth Circuit dismissed the nurse's interlocutory appeal.

*Matis* has parallels to the facts of this case. The nurse in *Matis* did not complete an intake form required in the policy manual; just so, JULIAN did not conduct and document a daily assessment of SAMPSON's status as required by Policy 12.4. The nurse in *Matis* and JULIAN both had every reason to know that the inmates they were caring for were seriously mentally ill: the

inmate of *Matis* reported that he took psychotropic medication for bipolar disorder, whereas JULIAN received extensively documented records of treatment from Dr. Stephen O'Neill which revealed that SAMPSON had been treated for many years, and had undergone multiple lengthy inpatient psychiatric hospitalizations, for serious mental illness and had recently spoken of suicide – and if JULIAN had read the pass-along book (which she claims she ordinarily does, just not with regard to SAMPSON), she would have known that SAMPSON's mother had reported SAMPSON's recent attempt to hang himself.

And, JULIAN, like the nurse of *Matis*, has tried to claim that the suicidal inmate in her care was behaving normally and not showing signs of suicidality – in the face of:

* SAMPSON's Request For Medical Care forms, which were submitted <u>to JULIAN</u> (August 6: "Need to be transferred to Norfolk Regional Center to Dr. Stephen O'Neill or I will die in here. My head is killing me. These meds are making me sick + confused." (*E69.*))

* The pass along book which JULIAN cannot remember reading with respect to SAMPSON, although she ordinarily does read the pass along book ("Troy Sampson all booked, meds were set up for tonight. He may ask for another Chlorpromazine, which he may have at 2330. The meds are on the nurse's desk. Also his mother called and advised me he attempted suicide two weeks ago – he tried to hang himself. 20 minute watch started. Since he seems unstable mentally, leave him in booking until the nurse sees him." (*E60.*));

* Dr. O'Neill's notes and his recommendation over the telephone that SAMPSON be maintained on suicide watch based on SAMPSON's recent comments and based on his knowledge of SAMPSON from treating SAMPSON for six years, through multiple lengthy inpatient hospitalizations.

* And whatever behavior that SAMPSON was exhibiting that was not documented in Defendants' document protection, that apparently warranted leaving SAMPSON on suicide watch from his admission on July 30 until his death on August 10.

This evidence "tends to contradict [JULIAN's and the other Defendants'] claim that [SAMPSON]

appeared happy," *see, e.g., Matis* at **2 – especially when coupled with the deposition testimony that none of the Defendants herein, JULIAN included, ever had a long enough conversation with SAMPSON to have proper and sufficient foundation to opine on SAMPSON's mental state. As in *Matis*, these contradictions and the undisputed evidence of what the nurse ignored should preclude entry of summary judgment.

## II.

## LIABILITY OF THE COUNTY

A.    Training

In a case brought under 42 U.S.C. § 1983, a municipality or county may be held liable for constitutional violations which result from a policy or custom of the municipality. *Yellow Horse*, 225 F.3d at 928. A failure to properly train employees is one way in which an entity can exhibit deliberate indifference toward the rights of others; another is the establishment of a policy or custom, even an "unofficial" policy or custom, of disregarding the risk of inmate suicide. *Id.* Both of those criteria are satisfied by the troubling evidence yielded by depositions in this case.

In the previously-discussed jail hanging case of *Turney v. Waterbury, supra*, the United States Court of Appeals for the Eighth Circuit sustained an order granting the county's motion for summary judgment. The court observed that the plaintiff had claimed only in generalities that Bennett County did not train its officers well enough in suicide screening and prevention. The only evidence on this issue, according to the *Turney* opinion, appears to be evidence that the county did provide manuals that inform officers how to recognize and respond to suicide risks. *Turney*, 375 F.3d at 762. Given the spareness of the plaintiff's allegation, that evidence was evidently enough to support a finding that the plaintiff had not met her burden to prove that the training was inadequate,

or that the current policies of the county evinced a disregard for inmates' rights.  **Id.**

The evidence obtained through discovery (only with leave from this Court, over the defense's resistance) impeaches the claim that Dodge County adequately trained its employees in issues of suicide prevention.  Two of the employees who had direct contact with SAMPSON – JULIAN and WILLMS – had **zero** suicide prevention training and had not even received training in the rest of the basic jail procedures, much less in Policy 12.4.  The other two employees on duty at the time of SAMPSON's death – CHILES and ROBESON – had not had any suicide prevention training since 2005.

B.      Custom or policy

In contrast to the unsupported allegation of **Turney**, we also have – thanks to the discovery we had to ask for, and litigate over, leave to conduct – produced evidence that impeaches the untruthful claims of Defendants' affidavits, and the brief written upon those affidavits, regarding Dodge County's training in suicide identification and prevention.  Defendants argue that

> Dodge County had policies in place that complied with the Nebraska Jail Standards. Further, Dodge County utilized training offered by the Nebraska Crime Commission to further train its staff on suicide recognition and prevention.  Dodge County also required officers to receive training at the Nebraska Law Enforcement Academy within one year of their hire date and additional yearly in-service training that included suicide in custody.  The policies and further requirements of DCC ensured that the officers received training on suicide recognition and prevention.

(*Memorandum Brief in Support of Defendants' Motion for Summary Judgment* at 30.)  Had we not asked for leave to conduct discovery, this Court would have had to take this paragraph as truthful. As discovery revealed, every statement in this paragraph – much like the contents of the affidavits that the individual defendants swore to be true – is misleading at best or outright false at worst.

56

**First,** Dodge County's unwritten policies did not comply with the Nebraska Jail Standards[28] because the unwritten policy was to not follow the written policy. The Nebraska Jail Standards incorporate a related document, the Nebraska Jail Standards Compliance Management Handbook for Jail Administrators, last revised in 1997. Section 2 of the Handbook is a "Daily Checklist," which ostensibly presents a listing of matters so important to running a jail that compliance must be checked on a daily basis. It includes:

> Are trained personnel on duty during each shift, including female staff to supervise female inmates? (Standards Chapter 2-003.02, 003.02A)[29]
>
> Are the times and results of staff observations and cell checks of high risk inmates, maximum security, mental health and intoxicated inmates being recorded? (Should be observed more frequently than once an hour.)[30]
>
> Are the dates and times that inmate medication was dispensed and the name o the staff member assigned being recorded? (Standards Chapter 10-002.03A through

---

[28]The Nebraska Jail Standards appear in Title 81 of the Nebraska Administrative Code and may be downloaded from website of the Nebraska Commission on Law Enforcement and Criminal Justice at http://www.ncc.state.ne.us/documents/jail_standards/jsd_min_rules.htm.

[29]The answer to this question on the checklist for August 10, 2006 would have been "no": the only officers available to work the floor were WILLMS, who was in her tenth day of employment and had not been trained in suicide intervention (or anything else), and CHILES, who was late to work and who was not helping WILLMS. WILLMS was not receiving any help or on-the-job training from CHILES – she was working alone. (**Willms depo.** 82:01.)

[30]The answer to this question is also "no." If anyone had looked at SAMPSON's medical watch log, **E41** – or, more correctly, had looked at the log and given a damn – he or she would have seen that correctional officers had repeatedly failed to watch SAMPSON as ordered. Correctional officers performing the checks either did not report the failed checks to their supervisors and JULIAN, or else the supervisors and JULIAN didn't care. (JULIAN glanced at the logs during her deposition and said, "I don't see any missed checks." (**Id.** 138:06.)) WILLMS admits she falsified at least one check on the date of SAMPSON's death. (**Willms depo.** 73:19 - 01.)

002.03D)[31]

Are entries on shift activities, routine or unusual incidents or occurrences being recorded?[32]

Has the classification status of inmates housed in safety cells been reviewed by the facility administrator and recorded in the log?  Are the assignment and housing of inmates in safety cells meeting the requirements of the Nebraska Mental Health Act? (Standards Chapter 6-002.02A, 002.02B, 002.02C)[33]

Were inmate requests for medical attention collected by staff and acted upon properly?  Was information provided to the proper medical authority?  Were medical

---

[31]"No" is again the correct answer.  Correctional staff forgot to give SAMPSON his psychotropic medication at least once (**Julian depo.** 107:16.), and neither JULIAN nor anyone else followed up to find out how and why that happened.  (**Id.** 111:23.)

[32]No.  Although CAMPBELL says that officers who escort inmates to court are required to document unusual incidents in a report (**Campbell depo.** 152:21.), no one documented SAMPSON's plea for mental health care at his bond hearing in any manner.  It is unclear how correctional officers are trained to document unusual incidents in court in a report, as that "requirement" does not appear in the Dodge County Policy & Procedure Manual (**E52**) or in any of the training materials produced by the defense.

[33]It is hard to know how this checklist item would have been answered, as Dodge County was not using its one and only safety cell for its one and only suicidal inmate.  SAMPSON was initially placed in a holding cell, and then was moved into general population.  When asked whether general population is adequate for monitoring a suicidal inmate, CAMPBELL said "depending on the circumstances."  (**Campbell depo.** 97:06.)  He was unable to explain what the "circumstances" are that would turn that answer into a straight "yes" or "no," and just said that "that is left up to the medical department and their discretionary power."  (**Id.** 98:20.)  The "medical department" as of August 10, 2006 was JULIAN, who had not yet received orientation (**Id.** 25:06.) and who had not read or been trained in DCDC's policies and procedures relating to suicide prevention, including Policy 12.4, before SAMPSON died.  (**Id.** 37:11.)
   There is no reason to think JULIAN used her discretion wisely.  For example, she <u>did not</u> use her discretion to read the pass-along book, in which an officer reported that SAMPSON's mother reported his recent attempt to hang himself.  (Maybe she would have read it if she had been trained, which she had not.)  She <u>did not</u> communicate to anyone the fact that Dr. O'Neill had told her that SAMPSON had suicidal thinking within the week of his arrest.  (Again, maybe she would have communicated that information if she had been trained, which she had not.)  Because of her sparse documentation, there is no evidence of the basis for any of JULIAN's exercises of her "discretion."

58

emergencies acted upon in an appropriate manner?  (Standards Chapter 10-002-02, 002.08)[34]

The "checklist" encapsulizes the Nebraska Jail Standards for jail administrators like CAMPBELL. The evidence in this case, compared against the "checklist," shows that COUNTY and CAMPBELL and their employees failed to follow the Nebraska Jail Standards, and did not train employees in these important details of the Nebraska Jail Standards.

**Second,** it is equally untrue to say that "Dodge County utilized training offered by the Nebraska Crime Commission to further train its staff on suicide recognition and prevention."  That statement in Defendants' brief is just false.  Not Defendants' affidavits, but Plaintiff's depositions[35] established that two of the personnel most closely involved with SAMPSON – Defendants WILLMS and JULIAN – had not received **any** of the purported "training offered by the Nebraska Crime Commission to further train its staff on suicide recognition and prevention."  Two other defendants, CHILES and ROBESON, had had no training in suicide prevention for two and a half years before

---

[34]JULIAN could not answer whether SAMPSON's medical request kites reflect increasing frustration by a mentally ill person with impaired coping skills on the one hand, or a petulant inmate "wanting his way" (in JULIAN's terms).  (**Julian depo.** 134:18.)  She could not answer this because she did not document most of her medical observations of SAMPSON (**Id.** 134:22.) and she cannot remember.  This is another example of inadequate training conferred by COUNTY on its one and only nurse in the one and only month of her employment before SAMPSON's death.

[35]It cannot be emphasized enough that to get the facts that proved Defendants' Affidavits to be false, we had to ask for and litigate over leave to conduct discovery.  It is really troubling that Defendants' mindset was that they could swear to and submit affidavits that they knew to be misleading at best and often outright false, and that they could thereafter resist our right to discover the facts that would prove their affidavits to be false.  A motion for summary judgment based on qualified immunity <u>should not</u> be an opportunity for a defendant to swear to falsehoods and then win on the grounds of "qualified immunity comes early in the case, so no discovery!"  We are grateful that this Court rejected that argument and let us find the truth.

SAMPSON's death.  Presumably Defendants knew that when they swore to their affidavits and approved the Brief in Support of Defendants' Motion for Summary Judgment, so one can only interpret the inclusion of this claim in Defendants' submission as an attempt to mislead this Court.

And, whatever training CAMPBELL, individually and as the Policymaker for Dodge County, did confer on his employees relating to suicide prevention appears to have been ineffective – a fact that he knew or should have known.  The Medical Watch Log (**E41**) for SAMPSON confirms that correctional staff did not take suicide watches seriously at all:

> \*     Staff repeatedly skipped suicide watches and/or falsified (by WILLMS' admission) the Medical Watch Log;

> \*     Their supervisors did not notice (or did not care); and

> \*     CAMPBELL, as the jail administrator, did not notice or did not care.

Is that what "training offered by the Nebraska Crime Commission to further train its staff on suicide recognition and prevention" taught Defendants to do?

C.      Inadequacy of Dodge County's policies, procedures and housing for suicidal inmates

In a footnote to ***Turney v. Waterbury***, the United States District Court wrote:

> [w]e note that [the plaintiff] makes no argument that the county is deliberately indifferent by thrusting known suicide risks like [the decedent] into situations which increase their chances of success, such as a single cell with exposed bars and bedsheets.

***Turney***, 375 F.3d at 762 n.3.  The ***Turney*** plaintiff may not have made that argument, but we do make that argument here.  Vested with the knowledge:

> \*     that SAMPSON had tried to hang himself just before he was jailed;

> \*     that SAMPSON still qualified for suicide watch;

> \*     that SAMPSON had begged the county court, during a bond review hearing,

for psychiatric help;

*   that SAMPSON was submitting kites with bizarre requests; and

*   that at least one inmate before SAMPSON had hung himself by tying a sheet around an air vent,

Dodge County failed to take any measures, much less reasonable measures, to prevent SAMPSON from killing himself. Put otherwise, CAMPBELL as Policymaker for Dodge County "[was] deliberately indifferent by thrusting known suicide risks like [SAMPSON] into situations which increase their chances of success, such as a single cell with exposed [air vents] and bed sheets," *see, e.g., Turney*, 375 F.3d at 762 n.3, and such as suicide watches no more often than every 30 minutes (and frequently less often than that, according to *E41*).

In the jail-hanging case of ***Gaston v. Ploeger***, 2007 WL 1087281 (10th Cir. 2007), one of the bases for awarding qualified immunity to the defendant sheriff was that nothing in the sheriff's training or experience had put him on notice that his suicide prevention policy was inadequate. The opposite is true in this case: CAMPBELL, as Policymaker for Dodge County, had every reason to know that his suicide prevention policy and suicide prevention training program was inadequate:

*   **CAMPBELL knew that a 2001 grand jury had made specific recommendations to prevent suicide. He also knew that as Policymaker for Dodge County, CAMPBELL had not adopted any of the grand jury's recommendations.** And the very failures identified by the 2001 grand jury were a major part of the breakdowns leading to SAMPSON's death. The 2001 grand jury specifically identified communication failures as a deficiency that needed correction, noting that the pass-along book was an inadequate means for staff to communicate with each other about inmate needs: in 2006, CAMPBELL had changed nothing, and staff's inclination/disinclination to read the pass-along book was still dispositive to the question of "who knows what." JULIAN admits that although she claims to normally read the pass-along book, she did not read the entry in the pass-along book stating that SAMPSON's mother had reported SAMPSON's recent attempted hanging.

61

\*      CAMPBELL, as Policymaker for Dodge County, knew that with Policy 12.4 in effect, 22 inmates were able to attempt suicide, with four successes, between 2000 and 2006.  With all of those suicide attempts, CAMPBELL never revised or even reviewed Policy 12.4 until sometime after SAMPSON's death, when JULIAN claims to have rewritten the policy for CAMPBELL's approval – and now, going on three years after SAMPSON's death, the proposed revised suicide intervention policy still sits on CAMPBELL's desk without action by CAMPBELL.

\*      For that matter, CAMPBELL, as Policymaker for Dodge County, has to this day not revised any of the policies or procedures in *E51*, the Dodge County Policy & Procedure Manual, even though the consultant Dodge County hired (Gary Bowker) identified serious deficiencies in communication policies that desperately require revision.

\*      CAMPBELL, as Policymaker for Dodge County, knew that air vents should be covered because inmate Darrough had hung himself from an air vent in 2001; and we know that air vents could be covered, because they are covered now (albeit not until after inmate Beerbohm's suicide, which followed SAMPSON's suicide).  But between 2001 and 2006, CAMPBELL not only failed to cover the air vents, but failed to even ask what alternatives were available for covering the air vents – and then in 2006, CAMPBELL approved the placement of SAMPSON, a suicidal inmate, in a cell with an air vent and a sheet.

\*      CAMPBELL, as Policymaker for Dodge County, knew his staff was inadequately trained and inadequately motivated to prevent suicide.  He knew CHILES was unreliable and excused violation after violation after violation by CHILES; he knew one of the inmates in his jail was on suicide watch; and yet CAMPBELL scheduled CHILES to work as the only other escort with an exceedingly green WILLMS, whom CAMPBELL knew was totally untrained in custodial suicide prevention methods.  CAMPBELL placed JULIAN in charge of keeping a suicidal inmate alive although he had not trained her in custodial suicide prevention methods either.

\*      CAMPBELL, as Policymaker for Dodge County, either did not bother to check on the care of his one and only suicidal inmate or, if he did check on it, he failed to address the legion failures that happened over the course of SAMPSON's incarceration.  CAMPBELL should have noticed that JULIAN was not following Policy 12.4 insofar as she was not conducting and documenting a daily assessment of SAMPSON's status.  He should have noticed that JULIAN failed to apprise herself of information that directly impacted risk assessment for SAMPSON, including the pass along book

> (which CAMPBELL had known since 2001 to be inadequate as a means of communication). He should have noticed that JULIAN was waiting up to four days to respond to SAMPSON's pleas for medical help, and was never actually following up by asking SAMPSON questions about why he was requesting a safety cell. He should have noticed that suicide watches were being missed and medication was not being administered, and that JULIAN and ROBESON were failing to follow up and investigate why correctional staff was taking such a lackadaisical approach to this life-and-death issue.

But he didn't notice, or else he didn't care.

The summation would be that although CAMPBELL, as Policymaker for Dodge County, oversaw an average of between three and four suicide attempts in his jail every year between 2000 and 2006, with four of those attempts successful, CAMPBELL did nothing (not just "nothing meaningful" but nothing, period) to even identify the conditions that were leading to suicide attempts in his jail, much less to rectify those conditions. He still has not rectified the inadequacies of Policy 12.4 and policies regarding communication to this day. CAMPBELL may do some things very well to justify his continued employment as jail administrator, but this case is about the one very important thing that he has ignored, and where he has refused to improve, since 2000 – keeping mentally ill inmates alive. This is deliberate indifference by Dodge County. Summary judgment is inappropriate.

## CONCLUSION

For the foregoing reasons, this Court should DENY Defendants' Motion for Summary Judgment Based on Qualified Immunity.

63

SHERRY LUCKERT, Personal Representative of the Estate of TROY SAMPSON, Deceased, Plaintiff,


/s/ Maren Lynn Chaloupka

By: _____
Maren Lynn Chaloupka, NSBA # 20864
CHALOUPKA, HOLYOKE, HOFMEISTER,
SNYDER & CHALOUPKA, LLC
1714 Second Avenue
Post Office Box 2424
Scottsbluff, NE 69361
Telephone:  (308) 635-5000
Facsimile:  (308) 635-8000
E-mail:  mlc@chhsclaw.net


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was sent via CM/ECF Filing to the following on this 17th day of February, 2009:

Jennifer Tomka
BOUCHER LAW FIRM
West Gate Bank Building, Suite A
5555 South 27th Street
Lincoln, NE  68512


/s/ Maren Lynn Chaloupka

_____