IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| SHERRY LUCKERT, Personal Representative of the Estate of Troy Sampson, Deceased, | ) ) ) ) |
| Plaintiff, | ) ) 8:07CV5010 |
| v. | ) ) ) |
| DODGE COUNTY, DOUG CAMPBELL, TIFFANY WILLMS, JO-EL CHILES, CYNTHIA JULIAN, and MARK ROBESON, in their individual and official capacities, | ) MEMORANDUM AND ORDER ) ) ) ) ) |
| Defendants. | ) ) |

This matter is before the court on a motion for summary judgment filed by defendant Dodge County and individual defendants Doug Campbell, Mark Robeson, Cynthia Julian, Tiffany Willms and Jo-El Chiles, Filing No. 36.[1]  This is an action for damages and injunctive relief for deprivation of civil rights under 42 U.S.C. § 1983, brought by Sherry Luckert, the Personal Representative of the Estate of Troy Sampson, on behalf of the deceased, Troy Sampson.  Sampson, a pretrial detainee, committed suicide by hanging himself with a bed sheet from a ceiling vent in his cell at the Dodge County Nebraska Corrections facility ("DCC") on August 10, 2006.  The defendants are Dodge County ("the

---

[1]This court dismissed defendants Stacy Huffman, Wayne Hank, and Larry Juedes on defendant's unopposed motion to dismiss. Filing No. 79. Also pending are the defendants' objection to plaintiff's exhibits (Filing No. 96) and the defendants' unopposed motion for leave to substitute signed affidavit of counsel (Filing No. 97).  The motion to substitute a signed affidavit will be granted and the objection to plaintiffs' exhibits will be denied as moot. Although the plaintiff did not follow NeCivR 56.1 by setting out numbered paragraphs, she adequately detailed her challenges to the evidence presented by the defendants.  The court considered the evidence to the extent it was relevant to issues germane to the case, and disregarded irrelevant evidence.

County"); Doug Campbell, Director of Corrections; Mark Robeson, Lieutenant; Cynthia Julian, correctional center nurse; and Tiffany Willms and Jo-El Chiles, correctional officers.

In their motions for summary judgment, the defendants argue that the plaintiff cannot establish liability on behalf of the County or any of the individual defendants. The individual defendants assert they are entitled to qualified immunity with respect to the claims against them in their individual capacity, and to sovereign immunity for the plaintiff's claims against them in their official capacities. The defendants also argue that they are entitled to summary judgment on plaintiff's claims that "sound in tort" for failure to comply with the Nebraska Political Subdivision Torts Claim Act. Finally, the defendants contend that they are entitled to judgment on the plaintiff's equal protection claim because the plaintiff has failed to state a claim upon which relief can be granted. On review of the record, the court finds that the defendants' motion should be denied.

## I. FACTUAL BACKGROUND

The uncontroverted evidence shows that Sampson was admitted to DCC on July 30, 2006. Filing No. 38, Index of Evid., Ex. 1, affidavit of Cynthia Julian ("Julian Aff.") at 2. Upon admission, DCC requires that all inmates fill out a questionnaire. *Id.* In response to questions about contemplating suicide, Sampson responded "no." *Id.* At the time of his admission, Sampson was placed on a schedule of suicide checks every 20 minutes, based on his medical history. *Id.* Defendant Doug Campbell, the Director of Corrections, noted in a "passbook" or log used for communication between shifts, that he had received a phone call from Sampson's mother who "advised [that Sampson had] attempted suicide two weeks ago—he tried to hang himself." Filing No. 91, Index of Evid., Ex. 54, DCC Passbook at 1. Campbell testified that he knew that Sampson "would be at higher risk for

suicide because he had a previous attempt." Filing No. 91, Index of Evid., Ex. 2, Deposition of Doug Campbell ("Campbell Dep.") at 200-01. Campbell reviewed the decision to place Sampson on a suicide watch and made the initial decision to place Sampson on a twenty-minute watch. *Id.* at 97; Ex. 54, Passbook at 1. Campbell, as Director of Corrections at DCC, knew that at least one other prisoner had committed suicide by hanging himself from the air vent in his cell. Filing No. 91, Index of Evid., Ex. 2, Campbell Dep. at 14.

On July 31, 2006, Cynthia Julian, DCC's nurse, assessed Sampson and noted that he had a number of mental problems, including post-traumatic stress disorder ("PTSD"), depression, and anxiety attacks. Filing No. 38, Index of Evid., Ex. 1, Julian Aff., Ex. 1C, Assessment at 2. Based on her impression that Sampson had "some depression" and a conversation with Sampson's treating psychiatrist, Dr. Stephen O'Neill, Julian placed Sampson on a thirty-minute suicide watch effective at 4:00 p.m. on July 31, 2006. *Id.*, Julian Aff. at 3. Julian reported changing his suicide watch from twenty to thirty minutes based on the fact that she "did not believe at that time [Sampson] was a danger to himself or others." *Id.* (stating that she changed Sampson's suicide watch from thirty to twenty minutes).

On July 31, 2006, Julian sent a list of Sampson's current medications to the psychiatrist at Norfolk Regional Center who treats DCC's inmates with mental health issues, Dr. Mohammad Shoiab. *Id.* Dr. O'Neill, Sampson's treating physician at Norfolk Regional Center, prescribed medications for Sampson until Dr. Shoiab could see him; specifically, Klonopin and Cymbalta. *Id.* Julian noted in her progress notes on Sampson that "Dr. O'Neill suggest[s] p[atien]t be put on suicide watch until medically/psychologically stable." Filing No. 91, Ex. 42, Progress Notes at 1.

Dr. O'Neill, who had treated Sampson since September 2000, sent Julian Sampson's psychiatric records. Filing No. 91, Ex. 60, progress notes dated July 20-24, 2006, and a synopsis dated August 1, 2006. Dr. O'Neill noted that Sampson "stated that sometimes he thinks if he was not afraid of the pain, he might hang himself." *Id.* at 3. Dr. O'Neill noted Sampson's diagnoses:

> The patient's current diagnostic impression is as follows: Adjustment Disorder with Depressed Mood and Anxiety with Subsequent Worsening of Headaches; Posttraumatic Stress Disorder (from being abused in Mexican prison); Personality Change Secondary to Head Injury with Worsening of Pre-existing Antisocial and Paranoid Personality Disorder (can appear psychotic under stress); Cannabis Dependence (he likely does use to self-medicate for headaches); Personality Disorder not otherwise specified, with antisocial and paranoid features; Probable Post-Concussive Headaches, Secondary to Concession and Head Injury (from being hit with pistol in 1998).

*Id.* at 2. On July 24, Dr. O'Neill recorded:

> [SAMPSON] is under investigation for threatening his girlfriend. . . . The patient is under financial duress. . . . The patient continues to maintain that he has a blood clot or brain tumor. I again informed him that I felt he probably had post-concussion headaches, which are worse under stress. . . . He has had passing thoughts of suicide. . . . At this time, it appears that he has been suffering from symptoms that are exacerbated by an adjustment disorder related to further legal difficulties and a breakup with his girlfriend.

*Id.* at 6.

On August 2, 2006, Sampson asked for a room with "No window, No T.V. Solitary please with phone use. Need to see psychiatrist & counselor." Filing No. 91, Index of Evid., Ex. 39, Inmate Request Forms at 2. On August 7, 2006, Sampson submitted another request, stating: "The T.V. makes me go crazy please move me for the last time, im gonna loose it [sic], no T.V. please." *Id.* at 4. Later that day, Sampson submitted an Inmate Request Form stating: "The T.V. is making me go insane, put me in solitary

4

confinement A.S.A.P. please.  Need medication Adderall XL, Haladon." *Id.* at 5.  DCC staff responded:  "[t]he Safety Cell cannot be used at this time.  When something opens up we will try and move you." *Id.* at 4.

On August 6, 2006, Sampson submitted a Request for Medical Care, stating "Need to be transferred to Norfolk Regional Center to Dr. Stephen ONiell [sic] or I will die in here.  My head is killing me.  These meds are making me sick and confused." Filing No. 91, Index of Evid., Ex. 63, Request for Medical Care at 3.  Cynthia Julian responded:  "[t]hese are the medications Dr. Shoiab ordered for you.  It will take a week or 2 before you don't have side effects from them." *Id.*  The following day, August 7, 2006, Sampson requested to be moved to a "safety cell or solitary confinement 'NO T.V.'  I wish to be alone." *Id.* at 4.  Julian responded:  "No cells like that available. Sorry. We are full." *Id.*

On August 10, 2006, Lt. Robeson, shift supervisor, assigned Tiffany Willms and Jo-El Chiles as "escorts" on the Unit where Sampson's cell was located.  Filing No. 91, Index of Evid., Deposition of Tiffany Willms ("Willms Dep.") at 52.  An escort provides all the "hand-to-hand" contact with the inmates, including bringing them meal trays, escorting them to different parts of the jail, performing cell checks every 30 minutes for safety and security reasons, and performing medical/suicide watches as ordered.  Filing No. 38, Index of Evid., Ex. 6, Affidavit of Tiffany Willms ("Willms Aff.") at 2; Filing No. 91, Index of Evid., Deposition of Tiffany Willms ("Willms Dep.") at 51-52.

Robeson testified to numerous supervisory issues with respect to the quality of Chiles's work, reporting that he had been cited for carelessness, absenteeism and lateness.  Filing No. 91, Index of Evid., Ex. 6, Deposition of Mark Robeson ("Robeson Dep.") at 17-19; Ex. 9, Chiles Personnel File at 2-5, 13, 19, 21-25, 34.  Willms and Chiles

5

had not had suicide training. *Id.*, Ex. 2, Campbell Dep. at 79; Filing No. 91, Ex. 50, Chiles Training Report. On the day of the suicide, Willms had only completed ten days on the job at DCC and was "following" Chiles for training. *Id.*, Ex. 4, Willms Dep. at 17. Chiles was 45 minutes late that day. *Id.* at 49-51.

There is conflicting evidence with respect to whether and when Willms and Chiles performed suicide checks on Sampson on the day of his suicide. There are inconsistencies between the affidavits and the deposition testimony of Director Campbell and Tiffany Willms. See Filing No. 38, Index of Evid., Exs. 4 & 6, Affidavits, Filing No. 91, Exs. 2 & 4, Depositions.

## II. Discussion

### A. Law

Summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Harder v. ACands, Inc.*, 179 F.3d 609, 611 (8th Cir. 1999). Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmoving party to "go beyond the pleadings and 'by affidavit or otherwise' designate 'specific facts showing that there is a genuine issue for trial.'" *Planned Parenthood of Minnesota/South Dakota v. Rounds*, 372 F.3d 969, 972 (8th Cir. 2004) (*quoting Commercial Union Ins. Co. v. Schmidt*, 967 F.2d 270, 271 (8th Cir. 1992)). "A dispute is genuine 'if the evidence is such that a reasonable trier of fact could return a decision in favor of the party opposing summary judgment.'" *Id.* The burden of establishing the nonexistence of any genuine issue of

6

material fact is on the moving party.  Fed. R. Civ. P. 56(c); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970).  Therefore, if defendant does not meet its initial burden with respect to an issue, summary judgment must be denied notwithstanding the absence of opposing affidavits or other evidence. *Adickes,* 398 U.S. at 159-60; *Cambee's Furniture, Inc. v. Doughboy Recreational Inc.,* 825 F.2d 167, 174 (8th Cir. 1987).  "In ruling on a motion for summary judgment, a court must not weigh evidence or make credibility determinations." *Kenney v. Swift Transp., Inc.,* 347 F.3d 1041, 1044 (8th Cir. 2003).

"Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Koehn v. Indian Hills Cmty. Coll.,* 371 F.3d 394, 396 (8th Cir. 2004).  "Whether a given set of facts entitles the official to summary judgment on qualified immunity grounds is a question of law. But if there is a genuine dispute concerning predicate facts material to the qualified immunity issue, there can be no summary judgment." *Turney v. Waterbury,* 375 F.3d 756, 759-760 (8th Cir. 2004) (quotations omitted).

The Eighth Amendment prohibits prison officials' cruel and unusual punishment of inmates, and it has been interpreted as obligating prison officials to provide medical care to inmates in their custody. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976).  An inmate's "right to medical care is violated if prison officials' conduct amounts to 'deliberate indifference to [the prisoner's] serious medical needs.'" *Id*.  The conditions of confinement for pretrial detainees are analyzed under the Due Process Clause of the Fifth and Fourteenth Amendments, not the Eighth Amendment.  However, "the identical deliberate-indifference standard" is applied to both pretrial detainees and convicted criminals. *Vaughn v. Gray,* 557 F.3d 904, 908 n.4 (8th Cir. 2009); " *Coleman v. Parkman,* 349 F.3d 534, 538 (8th Cir.

7

2003) (noting that "The Eighth Amendment prohibits officials from acting with deliberate indifference towards an inmate's substantial suicide risk, and the Fourteenth Amendment['s Due Process Clause] extends at least as much protection to pre-trial detainees").

A showing of "deliberate indifference" by prison officials requires "a sufficiently culpable state of mind." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). Deliberate indifference has both an objective and a subjective component: the objective component requires a plaintiff to demonstrate an objectively serious medical need and the subjective component requires a plaintiff to show that the defendant actually knew of, but deliberately disregarded, such need. *Vaughn,* 557 F.3d at 908; *Gregoire v. Class,* 236 F.3d at 417 (8th Cir. 2000) (likening the standard to criminal recklessness). "To establish a constitutional violation, it is not enough that a reasonable official should have known of the risk, a plaintiff must establish that the official in question did in fact know of the risk." *Id.* "However, this knowledge is subject to proof by all the usual ways, including inferences based on the obviousness of the risk." *Id.* "[W]hile obviousness of the risk is not the ultimate inquiry, it may serve as circumstantial evidence that the officials actually knew of the risk." *Coleman,* 349 F.3d at 538.

"In evaluating an official's response to a known suicide risk, we should be cognizant of how serious the official knows the risk to be." *Gregoire,* 236 F.3d at 418. Mere careless diagnosis or treatment of a known serious medical need of prisoners is insufficient. *Williams v. Kelso,* 201 F.3d 1060, 1065 (8th Cir. 2000). Moreover, inadvertent failure to provide medical care is not sufficient to establish liability and mere discomfort and inconvenience do not implicate the Constitution. *Beck v. Skon,* 253 F.3d 330, 334 (8th Cir. 2001). An error or oversight, or failure to follow medical instructions can be determined to

8

amount to only negligence, and thus not to amount to deliberate indifference, as a matter of law. *Williams*, 201 F.3d at 1065 (finding no evidence of "deliberate indifference" where "[t]he only contention of deliberate indifference is that vital signs were not checked for a period of over six hours.").

Consequently, "even if an official knows of a risk, he is not liable for a subsequent injury if he responded reasonably to the known risk." *Gregoire*, 236 F.3d at 417. A prison official's not investigating an "earlier attempt . . . [and] placing [the prisoner] in a cell alone with a bed sheet and exposed ceiling bars" are examples of deliberate indifference to a suicidal prisoner's medical needs. *Turney,* 375 F.3d at 761; *accord Coleman*, 349 F.3d at 540 (holding that the placement of a suicidal prisoner in a cell with a bed sheet violates the "common sense rule," and consequently, constitutes deliberate indifference).

"Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights." *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) (quotations omitted). "To establish personal liability of [a] supervisory defendan[t], [the Plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights." *Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006). "A defendant will not be held liable under 42 U.S.C. § 1983 unless he was personally involved in causing the deprivation of a constitutional right or he either has or is charged with having actual knowledge that his subordinates are causing deprivations of constitutional rights." *Triplett v. Azordegan*, 570 F.2d 819, 823 (8th Cir. 1978).

"Respondeat superior or vicarious liability will not attach under § 1983." *City of Canton v. Harris,* 489 U.S. 378, 385 (1989). A municipality may be held liable under § 1983 for a rights violation when either the municipality had an unlawful policy or practice

that caused the rights violation, or a municipal "policymaker" directly caused the rights violation. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480 (1986); *Yellow Horse v. Pennington County,* 225 F.3d 923, 928 (8th Cir. 2000). A municipality can be held "liable under 42 U.S.C. § 1983 for constitutional violations resulting from its failure to train municipal employees." *City of Canton,* 489 U.S. at 380; *Turney,* 375 F.3d at 762 (noting that "failure to properly train employees is one way in which an entity can exhibit deliberate indifference toward the rights of others.").

The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan,* — U.S. —, —, 129 S. Ct. 808, 815 (2009) (*quoting Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson,* — U.S. at —, 129 S. Ct. at 815. "Qualified immunity is not just a defense to liability, it constitutes immunity from suit." *Hanig v. Lee,* 415 F.3d 822, 824 (8th Cir. 2005) (citations omitted). In deciding whether an official is entitled to qualified immunity, the court asks whether there was a deprivation of a constitutional right; and whether the right was clearly established at the time of the deprivation such that a reasonable official would understand his conduct was unlawful." *Vaughn v. Gray,* 557 F.3d 904, 908 (8th Cir. 2009). The qualified immunity defense is not available in an action to enjoin future conduct or in an action against a municipality. *County of Sacramento v. Lewis,* 523 U.S. 841 n.5 (1998). That the Eighth and Fourteenth Amendments protect prisoners or pretrial detainees

10

from deliberate indifference to serious medical needs has been clearly established since 1976. See *Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000). It has also been well established since 1994 that a risk of suicide by an inmate is a serious medical need. *Id.*

States and arms of the state possess sovereign immunity from suits. *Alden v. Maine*, 527 U.S. 706, 713 (1999). The Supreme Court "has repeatedly refused to extend sovereign immunity to counties." *Northern Ins. Co. of New York v. Chatham County, Ga.*, 547 U.S. 189, 193 (2006). The only immunities available to a defendant in an official-capacity action are those that the governmental entity possesses. *Hafer v. Melo*, 502 U.S. 21, 25 (1991).

### B. Analysis

The court finds the materials submitted in support of and opposition to the motion for summary judgment show that there are disputes of fact with respect to several issues. Viewing the evidence in the light most favorable to the plaintiff, the court finds that the plaintiff has presented evidence that shows that Sampson had a serious medical need and that the defendants had actual knowledge of that need. Whether the defendants responded adequately to that need is a question for the jury. The individual defendants are not entitled to qualified immunity for their actions because the plaintiff has alleged the deprivation of a federally-protected right that was clearly established at the time of Sampson's suicide. The County is not entitled to summary judgment in its favor because the plaintiff's allegations do not premise liability on respondeat superior but involve actions by a policymaker whose conduct can be considered that of the County. The plaintiff has refuted the affidavit evidence propounded by the defendants in support of their motion with deposition testimony that challenges the probity of the affidavits. There is considerable dispute about whether and when the suicide checks were performed as well as whether the

training and supervision of correctional center employees was adequate. Whether the conduct of defendants Willms and Chiles was merely negligent or rose to the requisite level of culpability for imposition of liability is also a question for the jury. The inconsistencies between affidavit and deposition testimony shows that the resolution of these issues involve credibility assessments. The court further finds the defendants' contentions regarding sovereign immunity, the Nebraska Political Subdivisions Tort Claims Act, and equal protection are without merit. The County is not entitled to sovereign immunity and the plaintiff does not assert state law tort claims. The plaintiff relies on the Fourteenth Amendment as a conduit for Sampson's Fifth Amendment Due Process claim and does not assert an equal protection claim. The evidence on the whole shows there are genuine issues of material fact. Accordingly,

IT IS ORDERED:

1. The defendants' motion for summary judgment (Filing No. 36) is denied.

2. The defendants' objection to plaintiff's exhibits (Filing No. 96) is denied as moot.

3. The defendants' unopposed motion for leave to substitute signed affidavit of counsel (Filing No. 97) is granted.

DATED this 6th day of July, 2009.

BY THE COURT:

s/ Joseph F. Bataillon
Chief United States District Judge